Filed 1/26/23  P. v. Garza CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>            v.<br><br>ANGEL MIGUEL GARZA,<br><br>        Defendant and Appellant. | F078900<br><br>(Super. Ct. No. 16CMS1483)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Michael J. Reinhart, Judge.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Ian Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

A jury convicted appellant Angel Miguel Garza of 14 felonies after he repeatedly molested his young daughter over a three-year period. He was sentenced to prison for 55 years to life, along with a consecutive determinate term of 127 years six months.

Appellant raises 18 claims in this appeal, including insufficiency of the evidence, ineffective assistance of counsel, and instructional and sentencing errors. We reject a majority of his claims. However, we agree with the parties that appellant's sentences in counts 14 and 17 must be stayed pursuant to Penal Code section 654.[1] We further agree with appellant that his sentences in counts 3 and 11 must also be stayed. Appellant's criminal intent in counts 3, 11, 14 and 17 was not separate and divisible from his criminal conduct in other counts. We will modify appellant's judgment accordingly, and direct the trial court to prepare an amended abstract of judgment that reflects a modified aggregate determinate sentence of 88 years eight months. Appellant's indeterminate prison sentence remains unchanged. As modified, we affirm the judgment.

**BACKGROUND**

We summarize the material facts that support the judgment. We provide additional details later in this opinion when relevant to the issues raised on appeal.

**I.      Appellant's Unlawful Behavior with Jane Doe.**

Jane Doe, who was born in June 2001, was 16 years old when she testified at trial. Appellant is her father. In general, Doe established that appellant engaged in lewd acts with her, including vaginal and anal intercourse, over a three-year period starting when she was 10 years old and ending when she was 13 years old. She related to the jury the specific incidents that she best remembered, which we summarize.

---

[1]      All future statutory references are to the Penal Code unless otherwise noted.

## A. The "R & N Market" incident (counts 7-9).

The first criminal incident did not involve sex, and it occurred when Doe was 10 years old. On July 1, 2011, appellant asked Doe to drive with him to the "R & N Market" (hereinafter the R & N Market incident). This store was close to their residence, only a few blocks away. Appellant did not promise her anything, but Doe testified that, based on past occurrences, it was very likely she would have received a treat—such as candy or a toy—if she went with him. She did not feel forced or pressured to go.

### 1. Appellant tells Doe to remove her pants.

Instead of driving to the market, appellant drove Doe to a rural location in Kings County near an orchard. Appellant parked. While they were inside the vehicle, appellant told her to take off her capri pants. Doe told the jury that she was "confused" and "scared" when appellant directed her to remove her pants. She said she was confused because that was not a "normal question" for a father to ask his daughter, and "that is not something dads are supposed to do." She testified that she unbuttoned her pants and pulled them down.

A sheriff's deputy happened to drive past the parked vehicle and he stopped near it to investigate. He did not initially see anyone inside but, as he drove up to it, he saw both Doe's and appellant's heads "pop up" from the front seats. Doe was in the driver's seat and appellant was in the front passenger seat. Law enforcement later realized that both of those seats were fully reclined, and no groceries were in the vehicle.

The deputy saw Doe "shimmying her shoulders and torso in the same fashion you would when you're putting your pants on." When he stood next to the vehicle, the deputy saw that both Doe and appellant were fully dressed, but Doe's pants were unbuttoned.

3.

The deputy spoke with appellant outside the vehicle.[2] At some point, the deputy walked back to his patrol vehicle and appellant looked at Doe through the window of their car. He told Doe that she had "better not say anything." She felt scared when he said that, and she told the jury that appellant said it with "a mean face." She explained at trial that she was scared because appellant "is a scary person." She later testified that she was scared because appellant had been "violent towards my mom, and my brothers, and me."

At the scene with the deputy, appellant reported that Doe's mother had spanked Doe and left a bruise on her buttocks. Appellant claimed he had been checking that bruise when the deputy had arrived. The deputy asked why he was doing that at this location, and appellant "never really gave a reason."

In contrast, Doe informed the deputy that her pants were tight, and appellant had been checking their size. According to the deputy, she did not appear upset or distraught.

Appellant was not arrested that night but law enforcement officials separately interviewed appellant and Doe at the sheriff's office regarding the circumstances. They provided conflicting accounts of what had occurred.

### 2. Doe's statements to law enforcement that night.

Doe told the jury that she did not tell officials the truth that night when she was asked what had happened. At the sheriff's office, she falsely stated that she had been in the driver's seat looking for appellant's cell phone. She also said her pants had been too tight, and she had a stomach ache. She claimed that appellant had told her to unbutton her pants to help with her stomach ache. She also mentioned a bruise on the back part of her leg that appellant had wanted to see. Doe said she had received a bruise a few days before at school from falling off of a bench.

---

[2] The deputy testified that he recognized appellant once appellant stepped out and they met at the rear of appellant's vehicle. The deputy did not explain to the jury how or why he knew appellant.

Doe was wearing "Jean capris" when this incident occurred. Although Doe had claimed that her pants were too tight, an interviewing deputy noticed that she wore a belt around her pants, and her pants seemed loose and one size too big. At the sheriff's office, Doe tried to roll up the capris to show the bruise, but the pants would not roll up high enough. Doe showed a female detective the bruise on her upper thigh. Doe had to pull down her pants to expose the bruise, which was about the size of a quarter.

During her interview at the sheriff's office, Doe denied that anyone, including appellant, had ever touched her inappropriately. Doe said that her relationship with appellant was good, she loved him, and she liked spending time with him. She reported that, if someone did touch her inappropriately, she would tell her parents. A deputy noticed that Doe would change the subject or look down when this incident was brought up.

### 3. *Appellant's statements to law enforcement that night and CPS's plan.*

Appellant told a detective that night that Doe pulled down her pants so he could see a bruise she had. Appellant had claimed that Doe's mother, his then estranged wife, had spanked Doe and left a mark. According to appellant, Doe was showing him the bruise when the deputy pulled alongside their parked vehicle.

Child protective services (CPS) was involved in law enforcement's investigation of this incident. Although Doe never indicated that she had been touched in a sexual manner, CPS implemented "a safety plan" in which appellant voluntarily agreed to stay away from Doe for an unspecified time. That safety plan was discussed with the family, including Doe's mother. It did not appear to CPS that appellant was living with Doe when this incident occurred.

#### 4. *Doe informed the jury that appellant did not want to see her bruise.*

At trial, Doe confirmed that appellant had not touched her sexually during this incident. She estimated that she had her pants unbuttoned for about 10 minutes before the deputy arrived. She also confirmed at trial that she did have a bruise on her left thigh when this incident occurred. She received the bruise after falling at school. She told the jury that, on the day she got the bruise, appellant had picked her up from school, and she had told him about it. That was a different day than the R & N Market incident.

During her trial testimony, Doe agreed that she had been talking with appellant about her bruise while they were driving to the market, and her stomach was hurting at that time. However, she denied that appellant had asked to see her bruise when he told her to remove her pants.

### B. *The "living room" incident (counts 1-3).*

Doe testified that appellant had vaginal sex with her in 2011 when she was 10 years old.[3] This incident occurred at night in their living room when her mother was at work (hereinafter the living room incident). Doe testified that she was in pain and crying. She told the jury that she believed this incident lasted more than an hour.

During this incident, Doe's two younger brothers had been present in the house in the bedroom they shared with Doe. At time of trial, her brothers were 14 and 10 years old, which would have made them approximately eight and four years old, respectively, when this incident occurred. Doe never told her mother or her brothers what had happened. Doe explained that she did not report this incident to her mother because

---

[3] During her initial trial testimony, Doe had said that this living room incident happened when she was 10 or 11 years old. During rebuttal testimony, however, Doe clarified that she was 10 years old when this first incident of sex had occurred, and she was "positive" that she had been 10 years old. She explained that, although she had previously been unsure about her age, she had reviewed a calendar and realized she had been 10 years old when this occurred because she had started summer school when she was around 10 years old and she was 10 years old entering the fifth grade.

appellant had hit her, and he kept saying she had "better not tell" or Doe would never see her mother again.

Doe testified that, after the first incident of sex, other incidents occurred "multiple times." She stated that appellant sometimes gave her a pain pill after he had sex with her.

### C. The "choking" incident (counts 13 and 14).

Sometime after the living room incident, and when Doe was 11 or 12 years old, appellant called her to the bedroom that she shared with her brothers. Doe resisted him and he grabbed her arm. She tried to pull away but he hit her arm. She was crying. She said she was going to tell her mother. She got to the bedroom door but he pushed her to the ground and he choked her with both hands wrapped around her throat (hereinafter the choking incident). Appellant kept saying that she had "better not tell" her mother. Doe did not black out or lose consciousness. Her clothes were on during this incident, and he did not have sex with her on this occasion.

### D. The "carrying" incident (counts 11 and 12).

When Doe was 13 years old or younger, she was asleep one night and appellant carried her into the living room (hereinafter the carrying incident). Her brothers were in the bedroom from where appellant had picked her up. The lights were off in the house and her mother was gone. Appellant kept telling her, "[S]hush." He removed his clothes and her clothes. Once naked, he did the "same thing as always." He placed his penis inside her vagina. She thought it lasted more than an hour, maybe two hours.

She testified that she was "crying and moving." He told her that the longer she took, the longer she would have to be there. She was hurting, tired, sad and scared. She tried to push him away. He was mad, and he looked at her "all mean." He would get irritated and would not let her go to sleep. He held down her arms.

7.

### E. The "final" incident involving sodomy (counts 5, 6, 15 & 17).

Doe testified that the final incident with appellant occurred when she was 13 years old (hereinafter the final incident). Her brothers were in the living room and her mother was elsewhere. Appellant called Doe to her bedroom and he locked the door behind her. He told her to lie down on the carpet. He pulled down her pants and he pushed his penis inside her "butt hole." She was crying and it hurt. Appellant eventually said, "[F]ine," and he told her to lie on her back. He then had vaginal sex with her. She was in pain. She wanted to return to the living room, but he told her to wait, and she could go "in a minute." Appellant was interrupted when one of Doe's brothers knocked on the bedroom door.

Doe testified that, at some point after this incident, her brother reported the situation to her mother. Her mother confronted Doe and asked if appellant had locked her in the room with him. When Doe said yes, her mother asked her why she had not told her. Doe said that appellant had told her not to say anything. Doe's mother left that day with the children and they stayed with Doe's aunt.

## II. Doe Discloses Appellant's Criminal Behavior to Law Enforcement.

Doe did not tell her mother or brothers what had happened inside the locked bedroom during the final incident. However, her mother had her speak with a former police officer, Donovan Sizemore. Doe's mother told Sizemore that she was concerned appellant may have molested Doe. Doe met with Sizemore and she admitted to him about some of the abuse she had suffered from appellant. Sizemore reported the information to the Kings County Sheriff's Department.

Doe testified at trial that, before she had agreed to speak with Sizemore, a family friend had reported seeing appellant in a nearby town, where Doe, her mother and her brothers had relocated after the final incident. Doe felt scared. She was worried that appellant might go to her grandmother's residence and take one of her brothers. She

panicked and told her mother that day that she did not want appellant to hurt them. She agreed to talk to someone about what had happened.

On or about April 27, 2016, a detective, Dakota Fausnett, interviewed Doe. Doe reported to Fausnett that appellant had inappropriately touched her and had had sex with her. She made it clear that appellant had placed his penis inside her vagina. Doe disclosed to Fausnett that her mother was ill and Doe was in fear of having to again live with appellant.

Fausnett explained to the jury that, at the time he learned of the sexual abuse allegations, appellant's last sexual contact with Doe had occurred about two years prior. Fausnett told the jury that Doe had described everything to him that she had testified about in court. She had reported that appellant gave her pain pills after "most" encounters. Doe reported to Fausnett that appellant had been with her inappropriately about 50 times.

Fausnett arranged for Doe to undergo an MDIC interview, which Fausnett observed.[4] During both her interview with him and during the MDIC interview, Doe reported over 50 inappropriate contacts with appellant. She said it did not occur every night, but it was most nights. She later said it was over 50 times.

At trial, Doe explained that, around the time she disclosed information to Fausnett, she had been worried that she might have to live with appellant. She was concerned that appellant "would probably hurt me some more or something." Doe agreed in court that she had told Fausnett that appellant had done this at least 100 times with her, but she denied saying it happened more than 150 times.

### III. Appellant's Interview with Fausnett.

In May 2016, Fausnett interviewed appellant at the sheriff's office regarding Doe's allegations. Appellant denied everything. He said he had never raped Doe and he

---

**4**      Fausnett explained that "MDIC" stood for a multi-disciplinary interview center.

had a good relationship with her. Appellant claimed that Kings County was out to get him, the allegations against him were false, and Doe's mother was trying to "set him up."

Regarding the R & N Market incident from 2011, appellant said he had "already beat it." According to appellant, those were false allegations and nothing had happened. Appellant claimed that he and Doe had gone to the market that night, and Doe had told him about her mother spanking her, both before and after leaving the market. Appellant stated that he had wanted to see Doe's bruise. However, he could not elaborate on why they were at that specific location to inspect the bruise. Appellant said he had called Doe's mother and was outside the vehicle so that Doe would not hear them arguing. He got in and told Doe to pull down her pants to see the bruise. The deputy then arrived.

Fausnett asked appellant about the reclined seats, and appellant could not explain why the seats had been reclined during that incident. Appellant said that Doe's mother was trying to set him up for previous charges, criminal threats, and "domestic violence." Appellant believed Doe's mother was trying to have him killed.

## IV. The Defense Evidence.

Appellant did not testify. He called several witnesses on his behalf, including a nurse practitioner who had examined Doe in April 2014. At the time of that examination, Doe was 12 years old and she was complaining of acne and irregular menstruation. The nurse practitioner is a mandatory reporter of sexual abuse or assault. She did not question Doe directly about whether she was suffering abuse, and she did not vaginally examine Doe. Instead, the visit was mostly for acne. However, the nurse practitioner did not notice anything during this visit that suggested Doe was suffering from abuse. Doe's demeanor appeared normal. The nurse practitioner denied noting any bruising or marks around Doe's face or neck.

**V.      The Rebuttal Testimony Regarding Child Sexual Abuse Accommodation Syndrome.**

After the defense rested, the prosecution called some rebuttal witnesses, including Anthony Urquiza. Urquiza informed the jury about child sexual abuse accommodation syndrome (CSAAS), which identifies trends regarding how children tend to disclose prior sexual abuse. Urquiza made it clear that he had neither evaluated nor spoken with Doe.

Urquiza explained at length regarding the characteristics that make up CSAAS. He testified that most children have a "significant delay" in reporting sexual abuse. It is often months or years before a child victim is able to disclose.[5]

**VI.      Appellant's Convictions and Sentences.**

The jury found appellant guilty in all 14 counts it was asked to consider.[6] Appellant, who admitted a prior strike conviction, was sentenced to prison for an indeterminate term of 55 years to life, along with a consecutive determinate sentence of 127 years six months. We summarize his convictions and the prison sentences he received for each count.

1.      In count 1, engaging in sexual intercourse with Doe, who was 10 years of age or younger, in violation of section 288.7, subdivision (a). The verdict form indicated that this was the living room incident.

Appellant was sentenced to prison for 25 years to life for this conviction, which was doubled because of his prior strike. An additional consecutive five years was imposed for his prior serious felony conviction.

---

[5]      We provide additional details regarding Urquiza's trial testimony later in this opinion when relevant to address some of appellant's arguments.

[6]      Following the prosecution's case-in-chief, the court granted a motion for judgment of acquittal regarding the charge in count 4. After jury instructions were given but prior to closing arguments, the prosecutor dismissed the charge in count 10. As the jury was deliberating, the parties agreed to dismiss the charge in count 16 because it was duplicative of the charge in count 6.

2.	In count 2, accomplishing an act of sexual intercourse with Doe by means of force, violence, duress, menace or fear of immediate or unlawful bodily injury in violation of section 261, subdivision (a)(2). The verdict form indicated that this was also the living room incident. The jury found true that Doe was under the age of 14 years when this crime occurred.

Appellant was sentenced to the upper term of eight years, which was doubled because of his prior strike conviction. This sentence was stayed.

3.	In count 3, committing a lewd and lascivious act upon Doe, who was under the age of 14, with the intent of arousing, appealing to, and/or gratifying the lust, passions or sexual desires of appellant by use of force, violence, duress, menace and/or threat of great bodily harm in violation of section 288, subdivision (b)(1). The verdict form indicated that this was the living room incident.

Appellant was sentenced to the upper term of 10 years, which was doubled because of his prior strike conviction. As we explain later in this opinion, we agree with appellant that this sentence must be stayed.

4.	In count 5, sodomy with Doe, who was under the age of 14, and appellant accomplished this act by force, violence, duress, menace and/or fear of immediate and unlawful bodily injury in violation of section 286, subdivision (c)(2)(B).

Appellant was sentenced to the upper term of 13 years, which was doubled because of his prior strike conviction.

5.	In count 6, a lewd and lascivious act (sodomy) upon Doe, who was under the age of 14, with the intent of arousing, appealing to, and/or gratifying the lust, passions, or sexual desires of appellant by use of force, violence, duress, menace and/or threat of great bodily harm to Doe in violation of section 288, subdivision (b)(1).

Appellant was sentenced to the upper term of 10 years, which was doubled because of his prior strike conviction. This sentence was stayed.

12.

6. In count 7, using false promises and misrepresentation to entice Doe to go to another part of the county (i.e., kidnapping) in violation of section 207, subdivision (b). The verdict form indicated that this was the R & N Market incident.

Appellant was sentenced to a consecutive subordinate determinate term of three years four months.

7. In count 8, attempting to prevent and dissuade Doe from making a report of her victimization to a peace officer in violation of section 136.1, subdivision (b)(1). The verdict form indicated that this was the R & N Market incident.

Appellant was sentenced to a consecutive subordinate determinate term of one year four months.

8. In count 9, committing a lewd and lascivious act upon Doe, who was under the age of 14 years, with the intent of arousing, appealing to, and/or gratifying the lust, passions or sexual desires of appellant by use of force, violence, duress, menace, and/or threat of great bodily injury to Doe in violation of section 288, subdivision (b)(1). The verdict form stated that this was the R & N Market incident.

Appellant was sentenced to the upper term of 10 years, which was doubled because of his prior strike conviction.

9. In count 11, unlawfully accomplishing an act of sexual intercourse with Doe by means of force, violence, duress, menace or fear of immediate or unlawful bodily injury on Doe in violation of section 261, subdivision (a)(2). The verdict form stated that this was the carrying incident. The jury found true that Doe was under the age of 14 years when this crime occurred.

Appellant was sentenced to the upper term of eight years, which was doubled because of his prior strike conviction. As we explain later in this opinion, we agree with appellant that this sentence must be stayed.

10. In count 12, committing a lewd and lascivious act upon Doe, who was under the age of 14 years, with the intent of arousing, appealing to, and/or gratifying the

13.

lust, passions, or sexual desires of appellant by use of force, violence, duress, menace and/or threat of great bodily harm to Doe in violation of section 288, subdivision (b)(1). The verdict form stated that this was the carrying incident.

Appellant was sentenced to the upper term of 10 years, which was doubled because of his prior strike conviction.

11. In count 13, committing assault on Doe by means of force likely to produce great bodily injury in violation of section 245, subdivision (a)(4). The verdict form stated that this was the choking incident.

Appellant was sentenced to a consecutive subordinate determinate term of two years.

12. In count 14, violating Doe's personal liberty through violence, menace, fraud and deceit in violation of section 236. This was the choking incident.

Appellant was sentenced to a consecutive subordinate determinate term of one year four months. As we explain later in this opinion, we agree with the parties that this sentence must be stayed.

13. In count 15, unlawfully accomplishing an act of sexual intercourse with Doe by means of force, violence, duress, menace or fear of immediate or unlawful bodily injury on Doe in violation of section 261, subdivision (a)(2). The verdict form stated that this was the last time (which we have referred to in this opinion as the final incident). The jury found true that Doe was under the age of 14 years when this crime occurred.

Appellant was sentenced to the upper term of eight years, which was doubled because of his prior strike conviction.

14. In count 17, violating Doe's personal liberty through violence, menace, fraud and deceit in violation of section 236. This was the final incident.

Appellant was sentenced to a consecutive subordinate determinate term of one year four months. As we explain later in this opinion, we agree with the parties that this sentence must be stayed.

14.

We address appellant's claims in the order they are presented in his opening brief.

## I. The Trial Court Did Not Abuse Its Discretion in Denying Defense Counsel's Motion to Withdraw.

On November 21, 2017, with the trial then set to start in a matter of days, appellant's appointed trial counsel, Peter Zerbib, filed a motion seeking to withdraw his representation. Zerbib raised an alleged conflict of interest as the grounds for withdrawal. After conducting an extensive inquiry, the court denied the motion.

On December 14, 2017, Zerbib again requested to withdraw his representation based on an alleged conflict of interest. The court again denied that request after conducting another extensive hearing. The trial eventually commenced on January 8, 2018.

Appellant argues that the trial court erred when it failed to grant Zerbib's motion to withdraw. He seeks reversal of all of his convictions.

### A. Background.

We summarize the two hearings wherein Zerbib sought to withdraw his representation in this matter. We also summarize other relevant instances wherein Zerbib discussed with the court his desire to withdraw.

#### 1. The November 21, 2017, request to withdraw.

On November 21, 2017, a trial confirmation hearing occurred. The prosecution declared that it was ready to proceed to trial. Zerbib, however, declared a conflict of interest regarding his representation of appellant. Zerbib stated that he could not discuss the conflict without violating the attorney-client privilege. The court had the courtroom cleared and a closed confidential hearing occurred.

Once the courtroom was cleared, the court asked Zerbib to describe the "nature" of the alleged conflict. Zerbib stated he was willing to discuss it if appellant waived the attorney-client privilege, and he said "a conflict has arisen in my ability to adequately

represent [appellant]." The court noted that, at that time, the trial was scheduled to start in a "couple days" and the court needed to have a better idea about the nature of the conflict. Zerbib said he believed case law existed that held he did not need to state the reasons for the alleged conflict on the record, but he had not been able to locate those opinions. Zerbib explained that he could not effectively represent appellant.

The court stated it needed something more, and Zerbib responded that he was not at liberty to disclose more without appellant waiving the attorney-client privilege. The court stated it was unable to evaluate whether or not a conflict of interest existed, and the court expressed concern that this could be an issue generated by appellant "simply to avoid trial this coming Monday." Zerbib disclosed that he had not informed appellant that he was going to declare a conflict of interest.

The court asked appellant if he wanted Zerbib removed. Appellant stated that he did not know anything about this issue. Appellant described some concerns he had about Zerbib's preparation for trial, but he emphasized that he wanted him to remain.

The court again asked Zerbib to "label" the conflict, and Zerbib responded it was "threats of complaints to the [S]tate [B]ar as to representation." He explained that, through the jail, he had been advised that appellant may have already notified the State Bar about allegations against him. The court responded that it did not believe such complaints necessarily created a conflict of interest, especially because appellant still wanted Zerbib to represent him.

Appellant explained to the court that he had drafted a letter the day before to the State Bar, and appellant assumed that Zerbib had learned about that letter from jail officials. The court asked Zerbib if anything else needed to be put on the record, and Zerbib reiterated his belief that a conflict still existed regarding his ability to represent appellant adequately. He believed his ability to represent appellant had been impacted and he could not continue.

16.

The court noted that only a grievance had been sent to the State Bar, and the court asked if there was anything else. The court told Zerbib that he could not "hide the ball" and he had to tell the court "at least a label or something that I can start to understand what your conflict is." Zerbib responded that he and appellant were at a "discord" and he could not present appellant's case. The court, however, noted that appellant wanted Zerbib to continue representing him.

Zerbib indicated to the court that he was not able to communicate with appellant, and their breakdown occurred during their conversations and some letters appellant had sent to him. The court responded that those examples actually showed that they were communicating. The court also noted that appellant wanted Zerbib to continue representing him. The court informed Zerbib that, unless he could show something else, Zerbib would not be relieved as counsel over appellant's apparent objection, especially on the (then) eve of trial.

Zerbib stated that, because this was a life case, he was "declaring a conflict" and he did not feel that he could effectively represent appellant if trial proceeded on Monday because of their "communication failure." The court responded that appellant was not reporting any communication problems, and the court did not understand the alleged problem in communication. The court noted that the representation might be difficult because they disagreed on trial tactics, but the court did not see a legal or ethical basis to remove Zerbib from the case. The court said it was willing to listen to more, but there was not enough based on the current circumstances. The court concluded the confidential hearing.

Once the prosecutor was present, Zerbib indicated that the defense was not ready to proceed to trial because some additional investigation was needed, along with locating certain witnesses.

## 2. *Zerbib's additional statements regarding withdrawing.*

On November 21, 2017, shortly after the closed confidential hearing occurred that was summarized above, the defense asked for a trial continuance to conduct additional investigation and locate certain witnesses. During this exchange, the court questioned whether the defense had been diligent in interviewing a potential witness. The prosecutor stated her concern about a later possible claim of ineffective assistance of counsel on appeal, noting that Zerbib had declared a conflict and he was stating that he had not accomplished some things that were necessary for trial. The prosecutor asked the court to either make a finding or appoint "standby counsel" to assist Zerbib if this trial went forward "to protect the People's appeal issues." The court responded that it had not found a conflict of interest, there was insufficient evidence to grant a continuance, and there were no other indications that Zerbib was not doing "a good and adequate job" in the representation.

While discussing grounds for a trial continuance, Zerbib mentioned that appellant was going to file a writ of habeas corpus with the appellate court, and appellant wanted the criminal proceedings stayed in the superior court. The anticipated writ was based on the prosecution's alleged failure to disclose Doe's medical records to appellant, which appellant contended were exculpatory and had prolonged his incarceration in jail. The court noted that this discovery issue had been previously addressed, and these medical records had been provided to the defense. The trial had been previously continued to give the defense sufficient time to prepare for trial. Appellant began to address the court directly, but the trial court asked Zerbib to articulate a legal basis for the court to do or not do something. Zerbib responded that this was, in part, why he had declared a conflict of interest, and he believed the court could declare a conflict based on his representation. Zerbib explained the basis for appellant's request to stay the criminal proceedings based on the prosecution's earlier failure to disclose Doe's medical records. The court stated it

18.

was not going to issue a stay of the proceedings because those records had been provided to the defense prior to the start of trial. The court then considered motions in limine.

Before the hearing regarding motions in limine concluded, Zerbib stated that he had located legal support for his request to withdraw. Citing the California Rules of Professional Conduct, former rule 3-700(B)(1), Zerbib stated that withdrawal is mandatory where an attorney knows or should know a client is bringing an action, conducting a defense, asserting a position in litigation, or taking an appeal without probable cause, but for the purpose of harassing or maliciously injuring a person. Zerbib stated that withdrawal was mandatory if a member of the State Bar knew or should have known that continued employment would result in a violation of these rules or of the State Bar Act. Even if not mandatory, an attorney could withdraw if he concludes that hostility between the client was such that he could not effectively continue to represent the client. The court responded that "none" of those issues had been shown. A short time later, Zerbib reiterated that he still felt a conflict existed. The court responded that it did not understand how Zerbib's cited authority had anything to do with the issue he had raised.

On November 27, 2017, the prosecutor requested a trial continuance because of witness unavailability. The court granted a trial continuance.

### 3. The December 14, 2017, request to withdraw.

On December 14, 2017, the court conducted another closed confidential hearing regarding Zerbib's renewed claim that a conflict of interest existed. Zerbib again declared a conflict of interest, stating there was a "complete breakdown" in the attorney-client relationship that impacted his ability to effectively represent appellant. The court noted that the last claimed conflict dealt with a report to the State Bar, which the court stated was insufficient to create a conflict. Appellant had previously wanted Zerbib to

19.

continue his representation, which is why the court previously denied the request to be relieved. The court asked if circumstances had changed.

Zerbib responded that the circumstances had not changed, but he had a case which he wanted the court to consider. Zerbib stated he was "stuck" because he could not divulge the conflict without violating appellant's rights to the attorney-client privilege. The court asked Zerbib to expand on his claim that there was a breakdown in communication. Zerbib cited *Aceves v. Superior Court* (1996) 51 Cal.App.4th 584 (*Aceves*), and stated that, based on his conversations with appellant over the past 16 months and the letters received from him, the attorney-client relationship had completely broken down. Zerbib believed he could not provide details because of his ethical obligations, which he described as placing him "in a box." The court stated that Zerbib needed to "find a way out of that box" because the court could not grant the request without more information.

The court asked appellant if he still wanted Zerbib to represent him. Appellant agreed, noting he had requested Zerbib to represent him in this matter because Zerbib had previously represented him in 2014. Appellant said he believed Zerbib was trying to create a conflict because Zerbib was going to start working for the district attorney's office once this case ended. Appellant expressed frustration that Zerbib was not visiting him in jail or responding to his request for certain motions to be filed. Appellant said he did not know anything about the state of his defense, and he thought Zerbib wanted him (appellant) to discharge him (Zerbib) through a *Marsden*[7] motion, which appellant was "not going to do." Appellant said that Zerbib was familiar with Doe. Appellant then stated his belief that Zerbib was really trying to "run" him over and "burn" him at trial because he was working with the district attorney's office.

---

[7] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

The court asked appellant if he believed he could still communicate with Zerbib, and appellant said, "Yes, I can." Appellant, however, expressed frustration that Zerbib was not filing a particular writ for him, and there was a delay in Zerbib providing him with information. Appellant stated that Zerbib was doing all of this, but it was "better for me" and appellant believed he could win on appeal. Appellant said he did not believe Zerbib could provide him with a fair trial, but appellant wanted to keep him and he was "not going to fire him." The court told Zerbib that, because appellant still wanted the representation to continue, the court was not going to relieve him unless it had "something substantive" from him.

Zerbib reiterated his belief that, based on *Aceves*, he did not need to provide a specific reason for the stated conflict of interest if it would divulge client confidences or breach ethical duties. However, Zerbib did not know whether or not *Aceves* involved a situation where the client wanted the attorney to be relieved. The court expressed frustration because Zerbib was saying a breakdown in communication had occurred by virtue of their communications, but appellant was saying he could still communicate with Zerbib and he wanted the representation to continue. Zerbib commented that he had told appellant many months prior that he was going to work for the district attorney's office at the conclusion of this case.

The court asked appellant that, if appellant believed Zerbib was colluding with the district attorney against his interests, why did he want the relationship to continue. Appellant responded that he thought the district attorney wanted Zerbib to be replaced, which he was not going to permit. Appellant believed Zerbib was familiar with his situation, and he did not want to waste time with a new attorney learning the case. Appellant said he had a good working relationship with the investigator that the court had appointed for the defense.

The court informed Zerbib that it did not have a basis to relieve him over appellant's objection. Zerbib responded that he believed the relationship had broken

down based on appellant's statements. Zerbib said he could not effectively represent appellant "because our relationship has had a complete breakdown."

The court countered that it did not sound like that. Instead, appellant was asking for Zerbib to visit him and discuss the case. Zerbib responded that appellant had stated a number of different beliefs about his (Zerbib's) hope to work for the district attorney's office, and that providing a poor outcome in this case might be tied to an employment opportunity as a prosecutor. The court noted that, despite those concerns, appellant still wanted Zerbib to represent him. Zerbib clarified that he had previously advised appellant that he was seeking employment with the district attorney's office, but he did not want to start until this case was finished. Zerbib had informed appellant that no offer had been extended, and other people had been hired.[8] According to Zerbib, appellant still continued to believe that somehow he (Zerbib) will gain employment with the district attorney's office once this case is done. Zerbib noted that appellant believed the county was going to "railroad" him, and Zerbib was working with the prosecution against him.

The court asked Zerbib how this had prevented him from preparing the case. Zerbib stated he could no longer talk with appellant, who had a number of motions he wanted filed on his behalf. Zerbib said he could not communicate with him regarding those motions. When pressed for details, Zerbib said he had to assert the attorney-client privilege, and he was stuck in an "ethical box."

The court stated that nothing established grounds to relieve Zerbib over appellant's objection on the day of trial readiness. The court said it needed something

---

[8] According to the California State Bar's website, defense counsel was subsequently hired by the Kings County District Attorney's Office. Appellant has filed a request for judicial notice of that fact, and respondent did not file an objection to appellant's request. We hereby grant appellant's request for judicial notice. (Evid. Code, § 452, subd. (h) [a court may take judicial notice of facts "not reasonably subject to dispute" that are "capable of immediate and accurate determination" from a source "of reasonably indisputable accuracy"].)

"concrete." Zerbib again referred the court to *Aceves*. The court, however, stated that *Aceves* did not deal with a client objecting to the removal of representation. The court said that Zerbib did not have the right "to Marsden his client." The court asked Zerbib if grounds existed for a mandatory withdrawal. Zerbib responded that he could not provide that information without violating the attorney-client privilege. Zerbib believed that his representation was enough based on *Aceves* and various opinions from the State Bar.

The court stated that it would be different if appellant agreed that a breakdown in communication had occurred. However, appellant had stated the opposite and he wanted Zerbib to continue the representation because he had unique knowledge of the case, and Zerbib represented his best hope for a fair trial. The court stated that Zerbib's "vague references" were insufficient to grant a motion to withdraw. The court noted that this was a very complex case and a new attorney could not just take it over. The court said it was not going to relieve him over appellant's objection unless Zerbib could give more.

Zerbib responded that he had already stated why a breakdown had occurred. He noted that appellant had indicated he wanted the representation to continue, but appellant also believed that Zerbib was working with the district attorney's office. Zerbib believed that appellant wanted the relationship to continue to have an issue for appeal. Zerbib said this had created a conflict, and it was a breakdown in their relationship.

The court thanked Zerbib for his comments, and the court denied the request to be relieved. The court stated that Zerbib could renew this request in the future if he had something "more concrete" to provide that would show a legal basis for removal in light of appellant's wishes.

### B. Standard of review.

An abuse of discretion standard is used to review a trial court's denial of a motion by an attorney to withdraw. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1234, overruled on different grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People*

23.

*v. Brown* (1988) 203 Cal.App.3d 1335, 1340.)  Under an abuse standard, we will not disturb a lower court's ruling unless " 'the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125, quoting *People v. Jordan* (1986) 42 Cal.3d 308, 316.)

### C.     Analysis.

Appellant asserts that the trial court erred when it failed to grant Zerbib's motion to withdraw in light of Zerbib's repeated representation that he had a conflict of interest, and that his relationship with appellant was irreparable.  According to appellant, the court should have inquired more into the issue of Zerbib seeking employment with the prosecutor's office.  Appellant contends that Zerbib's efforts to work for the district attorney was, without more, an apparent conflict of interest.  Appellant maintains that Zerbib would have not wanted to "push too hard" for him for fear of losing an opportunity to work as a prosecutor, and he contends that Zerbib was in fact ineffective at trial.  Appellant primarily relies on *People v. Jackson* (1985) 167 Cal.App.3d 829 (*Jackson*) to establish error, and he argues he has demonstrated an actual conflict that should have been the basis for discharging Zerbib prior to the commencement of trial.

Appellant's arguments are unpersuasive.  The trial court did not abuse its discretion in denying the motion for Zerbib to withdraw.

A defendant's right to effective representation by counsel includes the right that no conflicts of interest exist.  (*Holloway v. Arkansas* (1978) 435 U.S. 475, 482; *People v. Doolin* (2009) 45 Cal.4th 390, 459.)  " 'Conflicts of interest may arise in various factual settings.  Broadly, they "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests." ' "  (*People v. Doolin*, *supra*, 45 Cal.4th at p. 459, italics omitted.)

24.

The United States Supreme Court has stated that prejudice is presumed when a criminal defense attorney is burdened by an actual conflict of interest. (*Strickland v. Washington* (1984) 466 U.S. 668, 692 (*Strickland*).) However, prejudice is presumed only if a criminal defendant demonstrates that counsel " 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' [Citation.]" (*Ibid.*)

In *Aceves*, the opinion which Zerbib cited to the trial court, the appellate court held that, where issues of confidentiality prevent "counsel from further disclosure and the court [accepts] the good faith of counsel's representations, the court should find the conflict sufficiently established and permit withdrawal." (*Aceves*, *supra*, 51 Cal.App.4th at p. 592, citing *Uhl v. Municipal Court* (1974) 37 Cal.App.3d 526, 527–528 and *Leversen v. Superior Court* (1983) 34 Cal.3d 530, 539.) In *Aceves*, a deputy public defender discovered on the eve of trial that he had a conflict with his client and moved to be relieved. Counsel stated that he could not, without compromising his client's confidences and breaching his ethical duty, reveal the precise nature of the conflict. The office of the public defender, however, was willing to reveal sufficient information couched in general terms. It gave the court insight into the nature of the conflict: The public defender "described the conflict as one that (1) was confined to [the defendant] and the office of the public defender, (2) did not involve threats to witnesses or third parties, (3) did not relate to other cases and (4) had resulted in a complete breakdown of the attorney-client relationship …." (*Aceves*, *supra*, 51 Cal.App.4th at p. 592.) The trial court accepted these representations, finding them honest and sincere. (*Id.* at p. 592, fn. 6.) The Court of Appeal concluded that these limited disclosures were sufficient to support the motion for withdrawal as counsel. (*Id.* at p. 593.)

The *Aceves* court noted that, although defense counsel had not revealed the specific facts underlying the conflict, "he gave the court meaningful information about the general nature of the conflict and made clear he properly evaluated exceptions to the

25.

privilege; all parties, including the prosecutor, were satisfied the communication was privileged. Under the circumstances, the disclosure was sufficient to permit withdrawal." (*Aceves*, *supra*, 51 Cal.App.4th at p. 593, fn. omitted.) The appellate court rejected a contention it was impermissible for the trial court to accept the representation of defense counsel that a conflict had existed. As an officer of the court, the defense attorney was in the best position to identify a conflict and advise the court about the problem. (*Id.* at pp. 593–594.) Finally, *Aceves* noted that this conflict had impacted the entire public defender's office, which did "not declare conflicts lightly." (*Id.* at p. 594.)

In the present matter, *Aceves* does not establish that the trial court abused its discretion in denying the withdrawal. Contrary to what occurred in *Aceves*, the trial court did not accept Zerbib's vague grounds as establishing a conflict of interest. Appellant did not agree to permit Zerbib to withdraw. These are critical distinctions which make *Aceves* distinguishable. Moreover, the *Aceves* court made it clear that a trial court need not "accept a sweeping claim of conflict and 'rubber stamp' counsel's request to withdraw." (*Aceves*, *supra*, 51 Cal.App.4th at p. 592.) A trial court has a duty to explore any alleged conflict, and counsel has a corresponding duty to respond, and to describe the general nature, as fully as possible but within the confines of any privilege. (*Id.* at pp. 592–593.)

Here, the trial court repeatedly invited Zerbib to provide details, within the confines of any privilege, to establish that withdrawal on the (then) eve of trial was warranted. Zerbib, however, only provided vague explanations that were often refuted by appellant, such as a failure to communicate. Zerbib did not give the court meaningful information. An actual conflict of interest was not demonstrated and Zerbib did not adequately explain why a withdrawal was mandatory with a complex trial about to start.

Appellant claims that an actual conflict of interest existed. According to appellant, the trial court should have realized that Zerbib could not divulge any more information without jeopardizing his duty of confidentiality. We are not persuaded. The trial court

found that it did not have enough information to discharge Zerbib's representation over appellant's objection, and we see no basis for overturning that finding. We also reject appellant's assertion that the trial court should have inquired more into the issue of Zerbib seeking employment with the prosecutor's office. To the contrary, the court fully explored this issue with both Zerbib and appellant. Zerbib made it clear that he had fully apprised appellant of the situation. As the court noted, however, appellant still wanted Zerbib to represent him.

Finally, appellant's cited opinion, *Jackson*, *supra*, 167 Cal.App.3d 829, does not assist him. In *Jackson*, the criminal defense attorney was dating the prosecutor in his client's case, and that fact was not disclosed to the client prior to the conclusion of his criminal trial. (*Id.* at p. 831.) The appellate court concluded that, at a minimum, a potential conflict of interest had existed, which had required full disclosure to the client and an opportunity to obtain new counsel unencumbered by potential divided loyalties. (*Id.* at p. 833.) The *Jackson* court determined that a showing of actual prejudice was not required. (*Ibid.*) The defendant's judgment was reversed. (*Id.* at p. 834.)

Appellant argues that Zerbib was similar to the defense attorney in *Jackson*. According to appellant, Zerbib had hoped to be hired by the opposing district attorney's office, and Zerbib would have not wanted to vigorously pursue his cause. Appellant contends that, in claims later discussed in this appeal, Zerbib was "unprepared" and did little to advance "appellant's claim of innocence." We reject these arguments.

Unlike the situation that occurred in *Jackson*, Zerbib did disclose his potential conflict of interest to appellant regarding his attempts to find employment with the district attorney's office. Zerbib did not hide any information. Moreover, the trial court specifically stated that nothing indicated that Zerbib was not doing "a good and adequate job" in his representation. *Jackson* is distinguishable and it does not establish that reversal is warranted here.

27.

Based on this record, we will not disturb the trial court's ruling denying Zerbib's request to withdraw. The court conducted lengthy hearings and an actual conflict of interest was not established. Appellant was adamant that he wanted Zerbib to continue the representation. The court did not exercise its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. As such, an abuse of discretion is not present, and this claim fails.[9]

## II. Appellant's Arguments are Unpersuasive that he Failed to Waive any Conflict of Interest.

In a continuation of his claim above, appellant contends that the trial court failed to recognize an actual conflict of interest even though Zerbib had declared that one existed. Appellant asserts that he did not validly waive any conflict of interest, and the court failed to advise him of the "dangers of proceeding with conflicted counsel." He seeks reversal of all of his convictions.

We determine that this claim is meritless. In general, when a potential conflict of interest exists between a criminal defendant and his counsel, a trial court must obtain a knowing, voluntary, and intelligent waiver. (*People v. Mai* (2013) 57 Cal.4th 986, 1010.) If, after inquiry, a court determines that a waiver is necessary, it must satisfy itself that (1) the defendant has discussed with his counsel, or with an outside attorney if he wishes, the potential drawbacks of continued representation by counsel who may have a conflict of interest; (2) the defendant has been advised of the dangers of conflicted representation in his case; and (3) the defendant voluntarily wishes to waive that right. (*Ibid.*) If the court fails to fulfill these duties, reversal is required if the defendant can establish that counsel's performance was deficient, that an actual conflict of interest was the reason for the deficiency, and it is reasonably probable the deficiency adversely impacted the outcome of the case. (*Ibid.*)

---

[9] Because the trial court did not abuse its discretion, we do not reach appellant's arguments regarding prejudice.

28.

In the present matter, it is abundantly apparent that the trial court did not believe that an actual conflict of interest existed. This record supports the court's conclusion, and we have already determined that no actual conflict of interest was shown. As such, the trial court had no duty to obtain a waiver from appellant in that regard.

Moreover, we agree with respondent that appellant provided a knowing and intelligent waiver regarding any potential conflict of interest. Appellant made it very clear that he knew Zerbib was hoping to work for the district attorney's office. Appellant even believed that Zerbib was trying to "run" him over and "burn" him at trial. Despite those concerns, however, appellant was adamant that he wanted Zerbib to continue the representation because he had previously represented him in 2014. Appellant stated his belief that, despite Zerbib's attempts to "burn" him, he was better off because his criminal matter would return to the trial court after an appeal. Appellant said he did not believe Zerbib would provide him with a fair trial, but appellant wanted to keep him and he was "not going to fire him." The court asked appellant why he wanted the relationship to continue if he believed Zerbib was colluding with the district attorney against his interests. Appellant responded that he thought the district attorney wanted Zerbib to be replaced in this matter, which appellant was not going to permit. Appellant believed Zerbib was familiar with his situation, and he did not want to waste time while a new attorney learned the case. Appellant said he had a good working relationship with the investigator that the court had appointed for the defense.

Based on the extensive hearing which the court conducted, this record conclusively demonstrates that, to the extent a potential conflict of interest did exist from Zerbib's efforts to change employment, appellant provided a knowing and voluntary waiver. Appellant made it abundantly clear that he was fully aware of the situation, but he insisted on retaining Zerbib. The court exhaustively reviewed this issue with

29.

appellant. We reject appellant's arguments that reversal is required based on the lack of an adequate waiver.[10]

### III. Appellant Does Not Establish Ineffective Assistance of Counsel Regarding Evidence About the Lack of a SART Exam Done in this Matter.

Appellant argues that Zerbib rendered ineffective assistance by failing to call an expert witness at trial to discuss a "SART" examination.[11] He seeks reversal of his judgment.

#### A. *Background.*

During trial, Detective Fausnett explained on cross-examination that he did not have Doe undergo a SART exam. Fausnett believed such an exam would have had no value because appellant's last alleged sexual contact with Doe had occurred about two years prior to Fausnett's involvement. Fausnett explained to the jury that he had discussed this issue with other officials, including his supervisors and the MDIC team, and they had decided that a SART exam "had no value to it." Later in his testimony, Fausnett clarified that a SART exam is "very invasive." According to Fausnett, a

---

**10** After appellant was convicted in this matter, he requested the court to relieve Zerbib as his counsel pursuant to *Marsden*, *supra*, 2 Cal.3d 118. During the *Marsden* hearing, appellant complained that Zerbib had failed to communicate with him in the eight months following his conviction, and appellant was not receiving any information about an investigation into potential jury misconduct. Appellant had sent Zerbib a "tremendous amount of paperwork" regarding potential motions to be filed, but Zerbib was not taking any action. Appellant agreed he had previously opposed Zerbib's request to be relieved, but he had changed his mind following the trial and he wanted Zerbib removed as his counsel. Appellant was frustrated that Zerbib had not called certain witnesses to testify at trial, and appellant claimed he had felt pressured not to testify. The court noted it had witnessed the trial and Zerbib "appeared to have done everything that a reasonable attorney would do." At the conclusion of the *Marsden* hearing in September 2018, however, the court relieved Zerbib and new counsel was appointed.

**11** The jury learned that a SART examination involves a specially trained nurse who examines a sexual assault victim and takes swabs.

specially trained nurse takes swabs and examines a sexual assault victim's vagina, anus and breasts.

During cross-examination at trial, Zerbib asked Fausnett a series of questions in an attempt to establish that scarring on a victim's genitalia could show past trauma or sexual activity. The court sustained an objection based on a lack of foundation. Zerbib asked Fausnett if there were "any other additional purposes for a SART exam" other than to collect evidence. Following an objection, the court informed Zerbib that the defense was going into areas that required a specialized forensic medical practitioner to answer, and Fausnett had already indicated that he did not have the special training needed to answer these questions.

During appellant's case-in-chief, the defense did not call an expert witness to testify. During the prosecution's rebuttal, Urquiza testified about CSAAS. After Urquiza testified, Zerbib informed the court that he wanted to preserve the right to recall Urquiza to describe a SART examination, and its relevance in this case. Zerbib argued that such evidence went "to the overall issue" whether or not any sexual abuse had occurred. The court denied that request, noting that Urquiza was not a medical doctor. A short time later, Zerbib then informed the court that he had spoken with Urquiza on a break, and he would not be calling him as a witness after asking Urquiza if he had any expertise or knowledge that could assist the jury.

### B. *Standard of review.*

Under the federal and state constitutions, a criminal defendant is entitled to the effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Ledesma* (1987) 43 Cal.3d 171, 215.) To prevail on a claim of ineffective assistance of counsel, a defendant must establish two criteria: (1) that counsel's performance fell below an objective standard of reasonable competence and (2) that he was thereby prejudiced. (*Strickland*, *supra*, 466 U.S. at pp. 687–688.) The defendant has the burden

of showing both deficient performance and resulting prejudice. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

### C. Analysis.

Appellant asserts that his trial was rendered fundamentally unfair because Doe was not forensically examined, and this case was a credibility contest between himself and her. He contends that an expert witness could have explained how a SART exam can show the presence or absence of scar tissue on a molestation victim. According to appellant, Detective Fausnett provided a "false claim" to the jurors that a SART exam had no evidentiary value in this case. Appellant argues that Zerbib rendered ineffective assistance because he failed to refute Fausnett's testimony, and the defense failed to call an expert witness who could have explained the value of a SART exam. Appellant maintains that Zerbib failed to explain to the jury that the government's medical theory "was false."

Appellant's arguments are unpersuasive and he does not demonstrate ineffective assistance of counsel. He neither establishes that Zerbib's performance fell below an objective standard of reasonable competence, nor does he show that he was thereby prejudiced.

### 1. Appellant fails to demonstrate incompetency.

A claim of ineffective assistance of counsel is normally raised in a writ of habeas corpus. (*People v. Snow* (2003) 30 Cal.4th 43, 111.) In such a writ, relevant facts and circumstances can be explored which are not reflected in the record on appeal, such as why counsel did not pursue a particular trial strategy. (*Ibid.*) To promote judicial economy in direct appeals, a verified petition for a writ of habeas corpus should be joined if the appellate record does not provide an explanation why defense counsel acted in the challenged manner. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267.) Our Supreme Court has repeatedly stated that if the appellate record sheds no light on why

defense counsel acted or failed to act in the challenged manner, the claim on direct appeal must be rejected unless counsel was asked for an explanation and failed to provide one, or unless there can be no satisfactory explanation. (*Id.* at p. 266.)

We cannot determine from this limited appellate record why Zerbib did not call an expert witness to testify about a SART exam. We note, however, that—unless it stems from an unreasonable failure to investigate—it is generally a matter of trial tactics regarding which witnesses an attorney will call to testify, and an appellate court will not second-guess such decisions. (*People v. Bolin* (1998) 18 Cal.4th 297, 334; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.) It is unknown whether Zerbib consulted with a potential expert witness. If Zerbib did consult with an expert witness, we could only speculate regarding the scope and persuasiveness of any potential expert testimony.

In any event, we cannot state that there can be no satisfactory explanation to justify Zerbib's failure to present expert testimony regarding a SART exam. To the contrary, Zerbib could have determined that the fact Doe was not subjected to a SART exam called into question the veracity of her claims, which were uncorroborated by any forensic evidence. Zerbib could have been concerned that presenting an expert witness for the defense would have triggered rebuttal evidence from the People, which could have strengthened the case against appellant. Zerbib could have believed that the jury appeared unsophisticated so that scientific testimony would have been more confusing than helpful. Zerbib could have believed that the testimony was sufficient from the nurse practitioner who had examined Doe in 2014 and found nothing that warranted reporting any abuse.

Zerbib was not asked for an explanation regarding his failure to call an expert witness regarding SART exams. This record does not affirmatively disclose that no rational tactical basis supported Zerbib's failure in this regard. Thus, appellant's claim on direct appeal must fail. (See *People v. Mitcham*, *supra*, 1 Cal.4th at p. 1059 [rejecting

ineffective assistance claim because record did not reveal why defense counsel failed to present a defense].)

Finally, we reject appellant's assertion that Zerbib was ineffective in eliciting testimony from Detective Fausnett on cross-examination that led to Fausnett stating that no reason had existed to conduct a SART exam on Doe. Cross-examination is always risky, and even experienced defense attorneys might inadvertently elicit disclosures which are damaging to the defense. (*People v. Ervin* (2000) 22 Cal.4th 48, 94.) An appellate court will generally not second-guess an attorney's cross-examination tactics. (*Ibid.*) Instead, cross-examination comes within the wide range of tactical decisions that competent counsel must make. (*People v. Cleveland* (2004) 32 Cal.4th 704, 746.)

Based on this record, appellant has failed to establish that Zerbib's performance fell below an objective standard of reasonable competency. Accordingly, appellant did not meet his burden of proof in establishing the first prong of ineffective assistance of counsel. Therefore, this claim must fail. In any event, we also determine that appellant fails to establish prejudice.

### 2. *Appellant fails to establish prejudice.*

Without citing to any evidence in this record, appellant contends that scarring would be "expected" on Doe's genitalia if he had sexually penetrated her while she was 10 or 11 years old. He argues that photographs taken during a SART exam could have preserved possible exculpatory evidence. He clarifies that his argument does not hinge on assuming that there would be evidence of scarring. Instead, he states that no effort was made to obtain possible exculpatory evidence or to look for confirmation of Doe's claims of frequent penetration. He insists that this was a "close case" because his guilt rested exclusively on Doe's testimony, and he asserts that this case has elements that show he was falsely accused. He maintains that Zerbib presented no real affirmative defense to the jury, and he argues that it is reasonably probable the outcome of his trial

would have been more favorable to him if the jury had been advised of the likelihood that a SART exam could have disclosed whether Doe's claims of sexual penetration were true.

We reject appellant's arguments, and he does not establish prejudice. It is not enough for appellant to show that the alleged errors may have had some conceivable effect on the trial's outcome. Instead, he must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694.)

As an initial matter, we note that neither party discussed or even mentioned during closing arguments the lack of a SART exam in this case. Neither attorney mentioned Fausnett's belief that a SART exam was not needed. Because neither party raised this issue with the jury, it appears highly unlikely that the jurors would have given any weight or consideration to Fausnett's testimony in this regard.

Although Zerbib did not call an expert witness regarding a SART exam, Zerbib did remind the jurors during closing argument that they had heard testimony from the nurse practitioner whom the defense had called to testify. That witness had examined Doe in April 2014. Zerbib asserted that this examination occurred when the sexual abuse was allegedly occurring on a near daily basis. Zerbib reminded the jurors that, despite Doe's claims that the abuse was often happening around this time period, the nurse practitioner had found no signs of abuse, and Doe had appeared to her as "a normal child." Zerbib argued that the prosecution had failed to meet its burden of proving the allegations beyond a reasonable doubt, and the jury should find appellant not guilty.

Doe provided testimony in this matter that was overwhelming regarding appellant's criminal behavior with her. No reasonable explanation was given to the jury regarding why she might have a motive to lie. Her trial testimony was consistent in material aspects with her pretrial statements regarding the abuse.

35.

During closing argument, the prosecutor reminded the jurors that they had seen Doe "get up here and cry, and struggle through her testimony." The prosecutor asked the jurors to consider Doe's demeanor on the witness stand. The prosecutor submitted that Doe's demeanor was not from someone who had been manipulated to lie in court. Instead, it was the demeanor of a child who had been forcibly raped by her father. The prosecutor asked the jurors to find appellant guilty of all charges.

The jury found appellant guilty of all charges, and it found true all special allegations. Although no forensic evidence was introduced against him, we reject appellant's assertion that this was a close case. To the contrary, the prosecution conclusively established appellant's guilt through Doe's extremely persuasive testimony and her apparent credible demeanor on the witness stand.

It is not reasonably probable the outcome of this matter would have been different had the defense called an expert witness to discuss the possible value of conducting a SART exam. Doe established appellant's repeated criminal behavior, and confidence in the outcome of this matter is not sufficiently undermined based on Zerbib's alleged errors. Thus, appellant does not establish that any presumed error actually prejudiced him. As such, he has failed to establish both prongs of his claim of ineffective assistance of counsel.

**IV.    Appellant Does Not Establish Ineffective Assistance of Counsel Regarding the Uncharged Prior Bad Acts.**

Appellant asserts that Zerbib was ineffective because he did not object to, or attempt to exclude, Doe's trial testimony wherein she claimed that appellant had inappropriately touched her more than 100 times. Appellant argues that the jury was improperly permitted to consider these 100 uncharged prior bad acts. He contends that he suffered prejudice, and his convictions must be reversed.

36.

### A. Background.

During trial cross-examination, Zerbib asked Doe if "anything else" had occurred after the living room incident but before the choking incident. Without providing any details, Doe testified that "it happened multiple times" and there were "a lot of times" that other things happened with appellant.

During redirect, the prosecutor asked Doe if there were other incidents of sexual assault that had not yet been discussed. Zerbib objected that this was beyond the scope of redirect examination, which the trial court overruled. Doe stated that the incidents with appellant happened when she was 10 to 13 years old, and it happened almost every day. Doe agreed with the prosecutor that the times that had been discussed in court were the incidents that Doe had remembered the best.

During recross-examination, Doe agreed that she told Fausnett that the incidents with appellant happened more than 50 times, and she also agreed telling Fausnett that it happened more than 100 times. However, she denied recalling that she told Fausnett that this had happened more than 150 times. A short time later, Zerbib asked Doe if it was her testimony that her father had touched her inappropriately almost every day between the time she was 10 years old to 14 years of age. Doe responded, "Not almost every day, it occurred."

### B. Analysis.

Appellant notes that his jury was not instructed on how to consider any prior uncharged crimes. He argues that Doe's generic testimony about these uncharged acts had little probative value but was highly inflammatory. He contends that Zerbib should have sought exclusion of this testimony through various provisions in the Evidence Code. He maintains that Zerbib did very little to present a defense, noting that Zerbib failed to follow through on showing a diagram to Doe that could have established how small their

37.

residence was when these incidents occurred,[12] and the defense never called Doe's mother or brothers to testify. Appellant asserts that such evidence could have demonstrated how improbable it was for appellant to have "undiscovered access" to Doe.

We reject this claim. This limited appellate record sheds no light on why Zerbib failed to raise the objections which appellant now contends establishes incompetency, and appellant did not file a verified writ of habeas corpus concurrent with this appeal. Our Supreme Court holds that a defense attorney may choose not to raise an objection for numerous reasons, and an attorney's failure to object "rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.)

We cannot state that there can be no satisfactory explanation to justify Zerbib's failure to object to Doe's disputed testimony. Zerbib could have reasonably determined that it was better not to draw unwarranted attention to Doe's vague and uncorroborated assertions. Zerbib could have reasonably believed that he had impeached Doe's testimony sufficiently with her prior inconsistent statements so that the jury would not find her credible. Zerbib could have reasonably concluded that Doe's assertion appeared unreasonable on its face, and jurors might reject it.

During closing argument, Zerbib questioned the veracity of Doe's claims, noting that the prosecution had not provided any corroboration for them. Zerbib acknowledged that corroboration was not legally needed in a sexual assault case. However, Zerbib noted that neither Doe's mother nor her brothers had been called to testify. Zerbib stated that Doe had claimed that the inappropriate touchings had occurred almost every day for three years. Zerbib argued that, if that were true, appellant was the "luckiest child

---

**12**    During Doe's cross-examination, Zerbib asked her to examine a hand drawn diagram of the residence. Doe stated that the residence "wasn't that big." Doe stated that the drawing was not quite correct because of differences in some furniture from when she had lived there. The prosecutor objected to that diagram being moved into evidence, which the court sustained.

molester in the world" because he was able to repeat this behavior for so long "with two other kids in the house." Zerbib asserted to the jurors that this scenario did not make sense, and appellant did not molest Doe.

Based on the arguments made to the jury, it appears that Zerbib made a tactical decision regarding how to respond to Doe's disputed testimony. In any event, this record does not affirmatively disclose that no rational tactical basis existed for Zerbib's failure to raise the evidentiary objections which appellant now contends were required. Zerbib was not asked for an explanation regarding his failure to object to Doe's disputed testimony. Because this limited record does not reveal why Zerbib acted as he did, appellant's claim fails.[13] (See *People v. Mendoza Tello*, *supra*, 15 Cal.4th at p. 266.)

## V. Appellant Does Not Establish Ineffective Assistance of Counsel Regarding the Introduction of Testimony About his Prior Convictions.

Appellant contends that Zerbib was ineffective in permitting the jury to learn about some of his prior convictions. He asserts that his judgment must be reversed.

### A. Background.

Prior to this trial, appellant had prior convictions for various felonies, including statutory rape, intimidation of a witness, and domestic violence. He previously served time in prison. Zerbib successfully obtained an order bifurcating the issue of appellant's prior convictions.

During trial, appellant called several witnesses to testify on his behalf. Through two of these witnesses, the jury received some information about appellant's prior

---

[13]    The parties disagree whether or not Doe's disputed testimony was admissible under Evidence Code sections 352, 1101, and/or 1108. We need not resolve that conflict regarding the admissibility of Doe's testimony, which is not material to resolving appellant's claim of ineffective assistance of counsel. Instead, this claim fails because this record does not affirmatively disclose that no rational tactical basis existed for counsel's failure to raise the evidentiary objections which appellant now contends were required. As such, we likewise do not reach appellant's arguments regarding alleged prejudice.

39.

convictions and incarceration.  We summarize that relevant testimony, along with certain relevant comments from Zerbib.

### 1. *The testimony from V.M. and Zerbib's statements to the court.*

V.M. testified that she knew appellant and his wife through a church she attended.  She had met them about four or five years before her trial testimony.  V.M. told the jury that appellant was involved "a lot with the church."  She had seen Doe interact with appellant, and she described Doe's interactions with appellant as "normal like a normal kid."  V.M. denied ever finding appellant to be "threatening or scary."

During V.M.'s testimony, the court asked Zerbib if he was offering her as a character witness regarding appellant.  Zerbib said, "Yes."  Later outside the presence of the jury, Zerbib clarified that V.M. was offered not only as a character witness, but in regard to Doe's relationship with appellant, which V.M. had personally observed.  Zerbib asserted that an issue in the trial was whether or not Doe had been scared, and whether appellant accomplished anything with force or fear.  The court ruled that V.M. could not provide opinion testimony, but she could relate her observations.  The court confirmed that, so far, V.M. had provided opinion evidence that appellant was not a violent person.  When V.M.'s direct testimony resumed, V.M. denied ever noticing anything about appellant's interactions with Doe when she was around them.

On cross-examination, the prosecutor confirmed that V.M. had not known appellant to be a violent person.  The prosecutor asked V.M. if it would surprise her to know that appellant had a prior criminal history.  V.M. stated that she knew appellant had been in prison before, but she did not know why.  She testified that she knew appellant had been "bettering his life."  In a series of questions, the prosecutor asked if it would surprise V.M. to know that appellant had been convicted for witness intimidation, statutory rape, and domestic violence.  In all three instances, V.M. admitted that this

information would surprise her. V.M. also admitted that, when she was spending time with appellant and his wife, she had not known this information.

Following V.M.'s cross-examination, Zerbib did not ask her any further questions.

### 2.    *The testimony from G.J.*

Immediately following V.M.'s testimony, the defense called G.J. to testify. Appellant had previously lived with G.J. and his family for a little over two years, and G.J. had employed appellant's wife for a short period of time. Their kids had played together.

G.J. told the jury that appellant used to have a lawn business. G.J. and his wife met appellant and discussed hiring him for their lawn care needs. According to G.J., appellant "didn't come across as a crazy person or anything like that, so we hired him." G.J. had known appellant since 2007, and he described appellant as "deeply spiritual," a hard worker, and overall "a genuine person." G.J. denied ever being personally scared of appellant.

G.J. knew about appellant's past criminal history, saying appellant had been "very forthcoming about it." G.J. had known Doe since the time he met appellant. At some point in 2011, G.J. had spent time with appellant and his entire family. G.J. stated that appellant was never angry towards the children when they played, and G.J. denied ever noticing "anything unusual" about Doe and appellant at that time.

G.J. recalled visiting appellant and his family at their residence in 2012. During that year, he saw Doe with appellant on approximately two occasions. He denied seeing "anything unusual" between them during that time period, and Doe seemed "[h]appy" around appellant.

Zerbib asked G.J. if he was aware whether appellant was no longer with his wife. G.J. stated that, at some point, appellant had called him and said he was in jail. The prosecutor objected to that testimony based on hearsay, which the court sustained. When

41.

testimony resumed, G.J. denied ever seeing "anything unusual" regarding appellant's interactions with Doe.

On cross-examination, the prosecutor confirmed with G.J. that appellant had informed him about his past. G.J. specifically agreed that he was aware of appellant's prior convictions for witness intimidation, statutory rape, and domestic violence. G.J. did not believe that appellant was a violent person, at least at the time he met him.

On redirect examination, Zerbib asked G.J. if appellant had ever told him when these crimes occurred, and how long ago they had occurred. G.J. answered affirmatively to both questions, and he told the jury that he believed appellant spent six years in prison. According to G.J., appellant told him that these crimes happened "when he was a younger person."

### B. Analysis.

Appellant maintains that Zerbib provided ineffective assistance because, despite initially bifurcating the prior convictions, he nevertheless permitted the jurors to learn about his prior incarceration and convictions, including statutory rape and witness intimidation.[14] Appellant asserts it was unreasonable for Zerbib to call V.M. and G.J. to testify because they added little to the defense but their testimony permitted the solicitation of prejudicial evidence regarding his prior imprisonment. Appellant contends that Zerbib could not have had any legitimate tactical reasons for his actions. He argues that a reasonable probability exists that, but for Zerbib's alleged errors, the result of the trial would have been different.

We disagree that appellant establishes ineffective assistance of counsel. We need not analyze whether Zerbib's performance was deficient because it is easier to dispose of this claim based on a lack of prejudice. Our high court recommends this approach. (*In re*

---

[14] According to appellant, Zerbib's "inaction and fumbling" with these witnesses also supports his arguments that he suffered prejudice from his counsel's conflict of interest.

42.

*Fields* (1990) 51 Cal.3d 1063, 1079; accord *People v. Mendoza* (2000) 24 Cal.4th 130, 164 ["If the defendant fails to show prejudice, a reviewing court may reject the claim without determining the sufficiency of counsel's performance."].) Appellant fails to show that there is a reasonable probability that, but for Zerbib's allegedly unprofessional errors, the result of the proceeding would have been different.

As an initial matter, the jury did not first learn about appellant's prior criminal history through the defense witnesses. Doe told the jury that, during the R & N Market incident, she had felt scared because appellant "is a scary person." She later stated that she was scared because appellant had been "violent towards my mom, and my brothers, and me." In a different portion of her trial testimony, she confirmed that, in 2012, appellant had become a "priest" or a "minister." At one point, the prosecutor asked Doe how old she was when appellant had become a pastor. Doe answered, "I think it was when he came out of jail in 2009."

Fausnett testified at trial about interviewing appellant. According to Fausnett, appellant had believed that Doe's mother was trying to set him up for previous charges, which included "criminal threats" and "domestic violence."

From both Doe's and Fausnett's testimony, the jury was exposed to some of appellant's prior criminal history long before the defense witnesses took the stand. The jury had already received evidence that strongly suggested appellant had been incarcerated, and he had engaged in prior crimes, such as domestic violence or making criminal threats.

As we have already discussed, Doe's testimony in this matter was significant and compelling regarding appellant's criminal behavior. Her pretrial statements were consistent with her trial testimony, and her testimony amply demonstrated appellant's repeated criminal behavior. Nothing established or even reasonably suggested a motive for her to lie.

43.

Although the jury heard testimony from two defense witnesses about appellant's prior convictions and incarceration, that testimony was very limited in duration and it was not emphasized. No details were provided about appellant's prior convictions. During closing arguments, neither attorney mentioned the prior convictions. The prosecutor never stated or even suggested that the jurors should find appellant guilty based on anything but his behavior with Doe. The prosecutor emphasized Doe's testimony and her demeanor on the witness stand as the grounds to find appellant guilty. Based on the lack of comment on this issue from either attorney, it is extremely unlikely that the jurors would have considered the sparse evidence of appellant's prior convictions when deliberating the specific charges in this case.

Finally, it cannot be stated that V.M. and G.J. did not provide any favorable testimony for appellant. Through these witnesses, the jury learned that appellant attended church, he had a business at one point, and these witnesses had formed positive relationships with him. V.M. knew that appellant had been incarcerated, but she told the jury that appellant was "bettering" himself. Although her testimony was vague, V.M. denied ever noticing anything regarding appellant's interactions with Doe.

G.J. similarly informed the jury that he had never noticed anything unusual about Doe and appellant during his limited interactions with them in 2012, and Doe had seemed happy around her father. Through G.J., the jury learned that appellant's prior crimes had occurred "when he was a younger person."

Although the jury learned about appellant's prior convictions, the jury also heard from people who had had some limited contact with appellant and his family, and those witnesses had not seen anything wrong regarding appellant's interactions with Doe. The jury learned that appellant's prior convictions occurred at a much earlier time in his life, and he had reinitiated himself back into society.

Based on the totality of this record, it is not reasonably probable the outcome of this trial would have been different absent Zerbib's alleged errors. Doe provided

44.

overwhelming testimony that established appellant's guilt. No reasonable explanation appears that would suggest any motive to lie. The prosecutor argued to the jury that Doe's demeanor was of a child who had been forcibly raped by her father. Thus, our confidence in the outcome of this matter is not undermined. (See *Strickland*, *supra*, 466 U.S. at p. 694.) Accordingly, appellant does not demonstrate prejudice, and this claim fails.

## VI.	The Trial Court did not Abuse its Discretion in Denying a Motion for New Trial Based on Jury Misconduct.

After appellant was convicted, he filed a motion for a new trial based on alleged jury misconduct.[15] It came to light that, during deliberations, jurors had discussed the fact that appellant did not testify. An investigator from the district attorney's office interviewed a juror, juror No. 10 (hereinafter "Juror No. 10"), and those recorded statements were the basis of appellant's motion for a new trial. The trial court denied the motion, finding that the jurors' discussion was not prejudicial. Appellant contends that the court's ruling was in error. He seeks reversal of all of his convictions.

### A.	Background.

We summarize the relevant facts that support appellant's argument that the trial court erred in not granting a new trial based on jury misconduct.

#### 1.	The relevant jury instruction.

The trial court instructed the jury that appellant had an absolute constitutional right not to testify.[16] The jurors were told that appellant could rely on the state of the evidence and argue that the prosecution had failed to prove the charges beyond a reasonable doubt.

---

[15]	It was not Zerbib who filed the motion for a new trial. Instead, following the postconviction *Marsden* hearing in September 2018, it was the newly appointed counsel who filed the motion for a new trial in December 2018.

[16]	When giving this instruction, the trial court misspoke and said that appellant had "an absolute constitutional right not to testimony."

45.

The jurors were cautioned that they could not consider for any reason at all the fact that appellant did not testify. They could not discuss this fact during the deliberations, and this could not influence their decision in any way.

## 2. *The motion for a new trial.*

Appellant's motion for a new trial was based on a recorded interview with Juror No. 10, which was conducted by an investigator for the district attorney's office. The parties stipulated that a transcript of this recording would be admissible in the same manner as a sworn affidavit.

According to Juror No. 10, the jurors had discussed appellant's failure to testify while they were deliberating this case. The jurors thought appellant was going to testify "but he didn't, so we all kind of like, uh, why didn't he go?" Another juror had asked, "Why didn't he go up there? Why didn't he, you know have something to say about his case?" Juror No. 10 stated that "everyone" talked about this, and jurors commented that it was "strange." Juror No. 10 herself thought it was "weird" that appellant did not testify and try to defend himself.

Juror No. 10 further explained that she watched a lot of television so, when she heard how long the trial was estimated to last, she "just assumed" appellant would testify. She stated that she did not know "if it was maybe me just thinking like, oh, automatic guilt then since he didn't go up there." When asked whether appellant's failure to testify factored into her verdicts, Juror No. 10 answered, "Not really. I guess I don't know. I was kinda [*sic*] hoping he would get up there to say something. I don't know if—'cause I mean obviously he was fighting that it never happened, so I mean just to clear his name maybe to go up there and say like if he did do it he's remorseful, or if he wasn't, or if he didn't do it, it was like, you know, this is absurd." Juror No. 10 then indicated that appellant's failure to testify did not "really" factor into her decision. Instead, she just "processed" what the parties had argued.

46.

According to Juror No. 10, all of the jurors had also wondered whether appellant's family was present in the court during trial. The jurors wanted to know who was in the audience and whether appellant's family was supporting him. Juror No. 10, however, denied taking those thoughts into consideration when deciding appellant's guilt. The investigator concluded the interview stating that, if she had understood Juror No. 10 correctly, Juror No. 10 had wondered why appellant did not testify, but she did not use that information in forming her decisions. Juror No. 10 agreed with that assessment.

### 3. The trial court's ruling denying the motion.

In January 2019, the trial court heard appellant's motion for a new trial. The court believed nothing showed that the jury had decided appellant's guilt based on appellant's failure to testify. The court concluded that actual prejudice was not shown, and it denied the motion.

In denying the motion for a new trial, the trial court stated it had reviewed statements from two jurors. As appellant notes in his reply brief, it appears the court was referring to both the recorded transcript from Juror No. 10 and to statements appearing in a declaration filed by Zerbib as part of an earlier motion to obtain jury identifying information. According to Zerbib's prior declaration, the jury foreperson had stated that the jury had considered why they did not hear directly from appellant regarding the allegations against him. According to Zerbib's declaration, the foreperson had been aware of the court's admonishment that appellant had a constitutional right to remain silent, but the jurors had wanted to hear directly from appellant.

### B. Analysis.

Appellant contends that jury misconduct occurred when all of the jurors discussed his failure to testify, which triggered an automatic presumption of prejudice. Appellant argues that the prosecution failed to rebut this presumption because Juror No. 10 was ambivalent about whether or not appellant's failure to testify had impacted her verdicts.

47.

Appellant further notes that the jury foreperson never admonished the jurors to not consider his failure to testify, and the government did not submit any other juror affidavits to contradict Juror No. 10's statements.  According to appellant, the court should have granted the motion for a new trial.

Appellant also contends that this situation was "exacerbated" because the jury discussed whether or not appellant's family was present in the courtroom.  According to appellant, this indicates that the jurors were looking for information from either appellant or his family that appellant was in fact not guilty of the charges.  Appellant asserts that his convictions must be reversed.  We disagree.  Although a presumption of prejudice was triggered by the jurors' misconduct, that presumption was rebutted.  The trial court did not abuse its discretion in denying the motion for a new trial.

### 1.    *This record does not demonstrate a substantial likelihood of prejudice.*

Misconduct occurs when jurors discuss a defendant's failure to testify in contravention of a direct court order.  (*People v. Lavender* (2014) 60 Cal.4th 679, 687; *People v. Leonard* (2007) 40 Cal.4th 1370, 1425 (*Leonard*).)  Juror misconduct of this sort gives rise to a presumption of prejudice that may be rebutted if the entire record discloses that there is no "substantial likelihood that the complaining party suffered actual harm."  (*People v. Hardy* (1992) 2 Cal.4th 86, 174; *Leonard*, *supra*, 40 Cal.4th at p. 1425.)  On appeal, this court independently reviews the record to determine whether there was a substantial likelihood of prejudice.  (*Leonard*, *supra*, 40 Cal.4th at p. 1425.)

In *Leonard*, several jurors, including the foreperson, discussed the defendant's failure to testify during the penalty phase of a death penalty case.  The jurors said they would have liked to have heard from the defendant because it would have helped them understand why he killed six people, and whether he was truly remorseful.  (*Leonard*, *supra*, 40 Cal.4th at p. 1424.)  At the hearing for a motion for a new trial, the trial court held that a substantial likelihood did not exist that the defendant was prejudiced by the

misconduct. (*Id.* at p. 1425.) The court observed that "wanting to hear defendants testify is natural." (*Ibid.*) The trial court also said that "merely referencing that they wish [the defendant] would have testified is not the same as … drawing negative inferences from the absence of testimony." (*Ibid.*) The California Supreme Court agreed with the trial court's analysis and found that the misconduct was not prejudicial. (*Ibid.*)

We agree with respondent that *Leonard* controls in this situation and it establishes that reversal is inappropriate. We reject appellant's argument that, because the entire jury discussed appellant's failure to testify, their collective comments cannot be considered "mere curiosity." Although the jurors in appellant's case should not have discussed this issue, their discussion was brief and it expressed a collective natural curiosity. Expressing wonderment about why appellant did not testify is not the same as drawing negative inferences from the absence of his testimony. "Transitory comments of wonderment and curiosity, although misconduct, are normally innocuous, particularly when a comment stands alone without any further discussion." (*People v. Hord* (1993) 15 Cal.App.4th 711, 727–728.)

There is no evidence that any juror said appellant's failure to testify should be used in reaching the verdicts. Juror No. 10 specifically agreed with the investigator that she did not use appellant's failure to testify against him. In an earlier motion, Zerbib's own declaration strongly indicated that the foreperson had been aware of the court's admonition that appellant had a constitutional right to remain silent. Zerbib's declaration did not suggest that any juror actually used appellant's failure to testify against him.

We agree with respondent that the jurors' improper comments should be viewed as transitory and fleeting. Further, the jurors' statements about appellant's failure to testify appear innocuous. The record does not show or even reasonably suggest that they were repeated or pervasive, and this record does not demonstrate a substantial likelihood of prejudice. Based on *Leonard*, the trial court did not err in denying appellant's motion for a new trial.

Appellant cites *People v. Cissna* (2010) 182 Cal.App.4th 1105 (*Cissna*) in an effort to demonstrate that respondent's reliance on *Leonard* is unavailing. *Cissna* does not assist appellant.

In *Cissna*, the defendant was convicted of a sex offense involving a minor under the age of 14. (*Cissna*, *supra*, 182 Cal.App.4th at pp. 1113–1114.) Beginning on the first day of testimony, the juror in question met with a friend and discussed the case on a twice-daily basis. (*Id.* at p. 1114.) The appellate court concluded that these daily discussions, which were similar to deliberations, had improperly interjected the views of a nonjuror who had not been vetted through voir dire, had not been sworn to follow the law, and had not heard all the evidence. (*Id.* at p. 1120.) These improper discussions had included the nonjuror's observation that " 'guilty people do not testify, and if the defendant was not guilty he would testify.' " (*Id.* at pp. 1114–1115.) *Cissna* held that in "the circumstances of this case," where the issue of the victim's credibility was of critical importance, "the discussion of defendant's decision not to testify carried a high potential of prejudice to the defense." (*Id.* at p. 1121.) The *Cissna* court determined that its facts were distinguishable from other opinions, including *Leonard*. (*Cissna*, *supra*, at p. 1121.) The nonjuror had encouraged the juror to consider issues that were improper and detrimental to the defense, and a new trial was warranted despite the trial court's general instructions to the jury not to discuss the case with other people and not to consider the improper matters. (*Id.* at p. 1122.)

Appellant contends that, as in *Cissna*, no physical evidence supported Doe's claims against him, and his guilt rested entirely on her credibility and his failure to testify. Appellant also asserts that his credibility had been weakened by Zerbib's alleged ineffective representation throughout the entire proceedings.

We disagree that *Cissna* is applicable here or that it compels us to disregard *Leonard*. Unlike in *Cissna*, no member of appellant's jury conducted secret discussions with a nonjuror regarding the evidence. Although appellant's jury improperly discussed

50.

his failure to testify, their conversation appears extremely limited in scope and duration. Evidence exists in this record that Juror No. 10 did not use appellant's failure to testify in reaching her verdicts. A declaration from Zerbib in an earlier motion also strongly suggests that the jury foreperson was aware of the trial court's admonition that appellant had a constitutional right to remain silent, but the jurors were curious why appellant did not testify. *Cissna* is factually distinguishable and it does not establish that reversal is required.

Finally, appellant argues that Juror No. 10's statement lacked credibility when she denied using appellant's failure to testify against him. According to appellant, Juror No. 10 was simply agreeing with the investigator's leading questions. Appellant notes that, earlier in her recorded interview, Juror No. 10 had said she was thinking that appellant's failure to testify might mean "automatic guilt."

We disagree that Juror No. 10's statements failed to rebut the presumption of prejudice. The parties stipulated that the trial court should treat her recorded interview as a sworn affidavit. Juror No. 10 agreed that, although she had wondered why appellant did not testify, she did not use that information in forming her decisions. Although Juror No. 10 admitted that she wondered if his failure to testify might mean automatic guilt, she never stated or suggested that appellant's failure to testify actually factored into her decisionmaking process. Appellant can point to credibility concerns surrounding Juror No. 10's statements. However, it is apparent that the trial court resolved that credibility issue against appellant, and we will not disturb the court's credibility determination because it is supported by substantial evidence. (*People v. Nesler* (1997) 16 Cal.4th 561, 582.)

## 2. *Appellant's remaining arguments are unpersuasive.*

Appellant argues that the trial court used the wrong legal standard when denying the motion for a new trial, and it erroneously relied on improper facts. Appellant raises three points to establish that the court erred.

First, the trial court never expressly acknowledged that the jury had considered the fact that appellant had not testified.

Second, appellant contends that the court improperly credited statements attributable to the jury foreperson, which were not in evidence as part of this motion, and which were based on double hearsay through the declaration of Zerbib. Appellant asserts that, because the motion for a new trial was based only on the transcript of Juror No. 10's interview, the court erred in relying on facts that were not before it.

Third, appellant maintains that the court's ruling demonstrates that it permitted Juror No. 10 to establish the subjective thought processes of the other jurors. This would violate Evidence Code section 1150, which prohibits evidence to show the effect of any event upon a juror either in influencing him to assent to or dissent from the verdict, or concerning the mental processes by which the verdict was reached.

These remaining arguments are unpersuasive. We have already concluded that reversal is not required because this record establishes that any presumption of prejudice was rebutted, and the trial court did not abuse its discretion. Thus, we need not fully address appellant's additional arguments regarding how the trial court conducted its analysis. We will not disturb the court's ruling, which was correct in law, merely because it was given based on allegedly wrong grounds or under an incorrect standard. Instead, because it is legally correct, the ruling must be sustained regardless of the considerations which may have moved the trial court to its conclusion. (See *People v. Zapien* (1993) 4 Cal.4th 929, 976.)

Based on this record, the presumed prejudice stemming from the jury misconduct was rebutted. Juror No. 10 specifically denied using appellant's failure to testify as a

factor in reaching her verdicts. Although the jurors should not have discussed this issue, their comments expressed a natural curiosity about why appellant did not testify. These comments were fleeting, and nothing demonstrates that the jurors may have used appellant's failure to testify as grounds to find him guilty. There is no substantial likelihood that appellant suffered actual harm. Thus, the trial court properly denied appellant's motion for a new trial. Consequently, reversal is not required and this claim fails.

## VII. Appellant has Forfeited his Claim that his Constitutional Rights were Violated Stemming from the Admission of Expert Testimony Regarding CSAAS and He Does Not Establish Ineffective Assistance of Counsel.

Appellant contends that some of his constitutional rights were violated when the prosecutor posed certain hypotheticals to Urquiza, the expert regarding CSAAS. Those hypotheticals mirrored certain facts from this case. Appellant seeks reversal of his judgment.

### A. Background.

We summarize the relevant background facts necessary to understand appellant's claim.

#### 1. The prosecution's motion in limine regarding CSAAS testimony.

Prior to the presentation of evidence in this matter, the prosecutor filed an in limine motion seeking, in part, permission to present expert testimony regarding CSAAS. At the hearing, the court stated that, in order for this evidence to be admissible, the prosecution had to first identify a "misconception" that this evidence was designed to correct. The prosecutor identified Doe's delay in reporting the abuse. The prosecutor agreed that this proposed expert testimony would be limited to explaining why Doe's behavior was not inconsistent with the alleged abuse.

The trial court reminded both attorneys to be familiar with a then recent opinion from the California Supreme Court, *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

The court noted that *Sanchez* prohibits the introduction of expert testimony that relies on case-specific facts.  The court, however, commented that the proposed expert testimony in this matter did not seem likely to violate *Sanchez*.  After hearing from Zerbib that the defense believed Doe had provided prior inconsistent statements, the court tentatively granted the prosecution's motion to introduce expert testimony regarding CSAAS.  The court stated its ruling ultimately depended on the nature of Doe's testimony, but the expert's proposed testimony appeared to be "relevant and necessary, given the limitations" it had indicated.  The court, however, did not explain what "limitations" it meant.

### 2. *Urquiza's trial testimony.*

After the defense rested, the prosecution called some rebuttal witnesses, including Urquiza.  Urquiza informed the jury about CSAAS, noting it was not a diagnostic tool but intended to educate about how children might respond after being sexually abused.  CSAAS identifies trends that research shows how children tend to disclose prior sexual abuse.

Urquiza explained that a child victim often delays reporting sexual abuse.  Once disclosure starts, it usually takes time for the full details to emerge.  Urquiza testified that many misconceptions exist about sexual abuse.  People often assume a sexually abused victim will disclose right away.  People incorrectly believe they would be able to recognize a child who has been sexually abused.  People wrongly believe that, if a victim retracts the allegation, then it was never true in the first place.  Finally, people erroneously think a victim who was sexually abused should be able to describe clearly and easily everything that happened, without any mistakes or errors in the disclosure.

The prosecutor asked Urquiza to imagine a hypothetical child who was forcibly raped by her father between the ages of 10 and 13.  This victim was removed from all contact with her father for two years.  The victim then became aware that her father

54.

might reenter her life. The prosecutor asked if that was something that could trigger the victim to begin a process of disclosing the abuse. Urquiza opined that this situation would cause a lot of anxiety for the victim, and the victim could either disclose the abuse or do something to put themselves in a position where they would not be again sexually abused.

The prosecutor asked another hypothetical in which a child was being abused by her father, but she did not inform her mother. The prosecutor asked why the child may not want to disclose the abuse to her mother. Urquiza responded that researchers were trying to understand that question. The only real consistent finding is that a victim tends to disclose to somebody he or she trusts.

During cross-examination, Urquiza confirmed that he had never evaluated or spoken with any minor involved in this criminal prosecution. He said it was hard to say how any particular child will respond to reporting sexual abuse in a specific way. He opined that most children will usually have a significant delay in disclosure.

### B. Analysis.

Appellant asserts that the admission of Urquiza's expert testimony violated the court's in limine order because the prosecutor presented hypotheticals to Urquiza that involved "case-specific" facts that assumed Doe had been sexually abused. Appellant maintains that this evidence violated his constitutional rights to a fair trial and due process. He argues that, absent this alleged error, it is reasonably probable at least one juror would have held reasonable doubt.

We reject appellant's arguments. This claim is forfeited and appellant does not establish ineffective assistance of counsel.

### 1. This claim is forfeited.

In part, respondent asks this court to reject this claim based on the forfeiture doctrine. According to respondent, the defense failed to object during Urquiza's

55.

testimony on the grounds that this evidence allegedly violated the trial court's order or involved case-specific facts. In contrast, appellant contends he has preserved this issue for appellate review because he raised some type of an objection during the in limine hearing regarding the admission of any CSAAS evidence. However, appellant concedes that the defense's objection during the in limine hearing in this regard was "weak." In the alternative, appellant argues this court should reach the merits of this claim based on ineffective assistance of counsel.

We agree with respondent that this claim is forfeited. When a trial court makes an in limine ruling that certain evidence is admissible, the party seeking exclusion must object during trial when the evidence is actually offered to preserve the issue for appeal. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 159; *People v. Brown* (2003) 31 Cal.4th 518, 547.) A motion in limine to exclude certain evidence is sufficient to preserve the issue for appellate review if it satisfies the basic requirement of Evidence Code section 353.[17] (*People v. Morris* (1991) 53 Cal.3d 152, 189, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

To preserve an evidentiary issue for appellate review through a motion in limine, the party seeking exclusion must (1) state a specific legal ground for exclusion that is subsequently raised on appeal; (2) direct the motion to a particular, identifiable body of evidence; and (3) make the motion at a time when the trial judge can determine the evidentiary question in its appropriate context. (*People v. Morris*, *supra*, 53 Cal.3d at p. 190.) "When such a motion is made and denied, the issue is preserved for appeal. On the other hand, if a motion *in limine* does not satisfy each of these requirements, a proper

---

[17] In relevant part, Evidence Code section 353 states that neither a verdict shall be set aside nor a judgment reversed from the erroneous admission of evidence unless (1) a timely objection was made that stated a clear specific ground and (2) the admitted evidence should have been excluded on the ground stated and the error resulted in a miscarriage of justice. (Evid. Code, § 353, subds. (a) & (b).)

56.

objection satisfying Evidence Code section 353 must be made to preserve the evidentiary issue for appeal." (*Ibid.*)

Here, the trial court only tentatively granted the prosecution's motion in limine to permit rebuttal testimony regarding CSAAS. The court stated its ruling ultimately depended on the nature of Doe's testimony, but the expert's proposed testimony appeared to be "relevant and necessary, given the limitations" it had indicated. The court, however, did not explain what "limitations" it meant.

Appellant's objection made during the in limine stage is insufficient to preserve this issue for appellate review. Appellant did not state the legal grounds for objection which he now raises on appeal. In any event, the trial judge was not in a position to determine this evidentiary question before it heard the trial evidence. Moreover, appellant did not raise these evidentiary objections during Urquiza's testimony. Thus, this claim has not been preserved for review, and it is deemed forfeited.

### 2. Appellant does not establish ineffective assistance of counsel.

Evidence regarding CSAAS allows jurors to understand the behavior of children who have been the victims of sexual abuse. (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069.) CSAAS evidence is admissible to dispel certain myths about the typical behavior of childhood victims of sexual assault. However, such evidence is inadmissible to prove that a victim's claim of molestation is true. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300; *People v. Bowker* (1988) 203 Cal.App.3d 385, 394 (*Bowker*).)

In *People v. Gilbert* (1992) 5 Cal.App.4th 1372 (*Gilbert*), an opinion upon which appellant relies, the Sixth Appellate District noted that it is not easy to delineate the line between the permissible and impermissible use of expert testimony regarding CSAAS. (*Id.* at pp. 1383–1385.) The *Gilbert* court recommended that the "better practice" was to limit an expert's testimony "to observations concerning the behavior of abused children

as a class and to avoid testimony which recites either the facts of the case at trial or obviously similar facts." (*Id.* at p. 1384.)

Appellant contends that the prosecutor elicited testimony from Urquiza that violated the principle addressed in *Gilbert*, i.e., case-specific facts were introduced. Appellant argues that the prosecutor's approach "contravened" the parameters set in the trial court's in limine order. He argues that his counsel could not have had any reasonable grounds to not object and "hold the prosecutor to the parameters regarding the admission of this evidence."

We reject appellant's arguments. He does not establish either prong necessary to show ineffective assistance of counsel.

### a. We cannot state that no satisfactory explanation exists for Zerbib's failure to raise the evidentiary objections.

This limited appellate record sheds no light on why Zerbib failed to raise the objections which appellant now contends establishes incompetency, and appellant did not file a verified writ of habeas corpus concurrent with this appeal. We cannot state that there can be no satisfactory explanation to justify Zerbib's failure to object to Urquiza's disputed testimony. Zerbib could have reasonably determined that it was better not to draw unwarranted attention to the hypotheticals which the prosecutor posed to Urquiza. During cross-examination, Zerbib elicited testimony from Urquiza that established CSAAS is not a diagnostic tool, and its purpose is to educate. Urquiza confirmed that this syndrome presumes a child has been sexually abused, and he agreed that CSAAS has no applicability if a child was not sexually abused. Urquiza made it clear during cross-examination that it would be improper to use CSAAS to make a determination about sexual abuse. Zerbib brought out that Urquiza had never evaluated or spoken with Doe.

During closing argument, Zerbib noted to the jury that CSAAS operates on a premise that molestation had occurred. According to Zerbib, however, the alleged

58.

molestation in this matter had not occurred and the jurors were asked to find appellant not guilty.

Based on Zerbib's cross-examination and his arguments to the jury, it appears he made a tactical choice regarding how to respond to Urquiza's disputed testimony. This record does not affirmatively disclose that no rational tactical basis existed for Zerbib's failure to raise the evidentiary objections which appellant now contends were required. A defense attorney may choose not to raise an objection for numerous reasons, and such a failure "rarely establishes ineffectiveness of counsel." (*People v. Kelly*, *supra*, 1 Cal.4th at p. 540.)

Appellant has failed to establish that Zerbib's performance fell below an objective standard of reasonable competency. Zerbib was not asked for an explanation regarding his failure to object to this disputed testimony. Because this limited record does not reveal why Zerbib acted as he did, appellant's claim on direct appeal must fail because we cannot state that Zerbib had no reasonable grounds for his actions. (See *People v. Mendoza Tello*, *supra*, 15 Cal.4th at p. 266.) In any event, appellant also does not show prejudice.

### b. *Appellant does not show prejudice.*

Appellant argues that he was prejudiced because the prosecutor urged the jurors to use Urquiza's testimony to find that the sexual molestation had "actually occurred." The record does not support appellant's position.

Neither attorney argued this matter in a manner that reasonably suggested the jurors could use Urquiza's testimony as grounds to conclude that the charged crimes had occurred. The prosecutor told the jurors that Urquiza did not appear in court to tell them whether he believed Doe. Instead, Urquiza had conveyed his experience with children who had been victims of sexual assault. According to the prosecutor, Urquiza had explained the trends that surround these children, such as keeping the abuse a secret and

disclosing it slowly over years. The prosecutor told the jurors to consider Urquiza's testimony when they considered how Doe had "handled the situation" of being "forcibly raped by her father." The prosecutor noted that Doe may have appeared happy and fine with appellant, but that was consistent with CSAAS.

With CALCRIM No. 1193, the jury was instructed that Urquiza's testimony could not be used as evidence that appellant was guilty, but only in evaluating Doe's credibility. Through other instructions, the jury was informed that appellant was presumed innocent, and the prosecution bore the burden to prove his guilt beyond a reasonable doubt. For each of the charged crimes, the jurors were told that the prosecution had to prove each of the required elements, which were provided.

Based on this record, appellant does not show that he was prejudiced from his counsel's failure to object to Urquiza's disputed testimony. Urquiza made it clear that he had never met Doe, and CSAAS was not designed to diagnose whether abuse had occurred. The jurors were instructed that Urquiza's expert testimony could not, by itself, establish appellant's guilt, and nothing the attorneys said reasonably suggested otherwise.

Through Doe's overwhelming testimony, the prosecution established each of the charged crimes. Thus, it is not reasonably probable appellant would have received a more favorable outcome had his counsel raised the objections which he now contends were required. Our confidence in the outcome of this matter is not undermined. (See *People v. Lucas*, *supra*, 12 Cal.4th at p. 436.) Consequently, appellant does not establish ineffective assistance of counsel, and this claim is forfeited.

## VIII. The Trial Court Did Not Err in Permitting the Prosecution to Rely on a Constructive Touching Theory in the R & N Market Incident and Any Presumed Error is Harmless.

In counts 7, 8 and 9, the jury convicted appellant for his conduct during the R & N Market incident. These convictions were for (1) kidnapping through a false promise or misrepresentation (§ 207, subd. (b); count 7); (2) attempting to dissuade a victim from

reporting to a peace officer (§ 136.1, subd. (b)(1); count 8); and (3) committing a lewd and lascivious act upon Doe, who was under the age of 14 years (§ 288, subd. (b)(1); count 9).

Appellant contends that the trial court erred because it allowed the prosecutor to present a new theory of liability late in the trial proceedings regarding the R & N Market incident, i.e., that appellant had committed a lewd act—not by directly touching Doe— but by causing her to remove her own pants. Appellant asserts that this error violated his rights to counsel and due process. He seeks reversal of his convictions in counts 7 through 9.

### A. Background.

#### 1. The oral arguments regarding the motion for judgment of acquittal.

At the close of the prosecution's case-in-chief, the defense brought a motion for a judgment of acquittal (§ 1118.1). In relevant part, the defense asserted that, pertaining to the R & N Market incident, the evidence did not establish a lewd and lascivious act, a kidnapping for purposes of molestation, or a prevention of Doe in reporting a crime.

The prosecutor responded that the evidence showed appellant caused Doe to change positions in the vehicle, and he told her to take off her pants. Doe was scared and nervous. The prosecutor noted that CALCRIM No. 1111 provides an alternative theory to a charge under section 288, subdivision (b)(1), that a defendant willfully caused a victim to touch his or her body through clothing. It was the People's position that appellant had ordered Doe to remove her pants and underwear, which was sufficient.

The court noted it had not heard any evidence that Doe was told to remove her underwear, and the court asked if the evidence showed an actual touching. The prosecutor asserted that the evidence was sufficient to find an intent for lewd and lascivious conduct based on appellant's order for Doe to remove her pants, her feeling scared and nervous, and a determination that appellant was not looking at a bruise. The

61.

prosecutor stated that this situation was similar to stripping. The court confirmed with the prosecutor that the People's theory was that the removal of Doe's pants was not mere preparation for, but was part of, the lewd and lascivious act to arouse appellant's interest. The court then denied the motion for judgment of acquittal in counts 7 through 9.

### 2.     *The relevant jury instruction.*

In relevant part, the court originally instructed the jury with CALCRIM No. 1111 regarding appellant's alleged lewd and lascivious conduct during the R & N Market incident. The jury was told that, to be guilty, appellant must have touched Doe, either on her bare skin or through the clothing.

After most of the jury instructions had been given, the court excused the jurors for lunch. The court informed the parties that it wanted to revisit the motion for judgment of acquittal regarding count 9. The court noted it had denied that motion because the People had argued it was sufficient if appellant had directed Doe to touch herself. The court stated that the instruction it had provided to the jury had not indicated that appellant could be liable by directing Doe to touch herself, and the court felt that the instruction needed to be modified to reflect the correct law, or the defense motion needed to be granted if the law required appellant to physically touch Doe.

The court asked if CALCRIM No. 1111 needed to be modified, and the prosecutor agreed. Zerbib objected, arguing that the prosecution had had multiple opportunities to review the jury instructions and the theories presented. The court responded that it was required to ensure that the jury was properly instructed. The court also noted that this was not a surprise to the defense because this theory had been argued during the motion for judgment of acquittal.

Following the lunch recess, Zerbib again objected to a modification of CALCRIM No. 1111. According to Zerbib, the parties had reviewed the jury instructions for the last two days, and both parties had agreed with the court that the given instructions reflected

the trial testimony. Zerbib asserted that the prosecutor had ample opportunity to request any modifications, but the prosecutor had agreed that morning to the instructions as given.

The court stated it was going to modify CALCRIM No. 1111 because it was a correct statement of the law and it was supported by facts from the trial. The court noted that, especially in light of the arguments presented at the motion for judgment of acquittal, an instructional modification was appropriate.

When the jurors returned to court, they were instructed to put "an X" through their written copies of CALCRIM No. 1111. The bailiff handed them new written instructions, which the court read aloud. In relevant part, the jurors were told that appellant could be guilty in count 9 of committing a lewd and lascivious act under an alternative theory that he willfully caused Doe to touch her own body either on her bare skin or through the clothing.

### B.     Analysis.

Appellant contends that his constitutional right to be adequately informed of the accusations against him, as well as his right to due process, were violated when the trial court modified CALCRIM No. 1111. Appellant asserts that this modification was based on a "new theory" raised during the instructional phase of trial. He argues that a violation occurred because the prosecutor had agreed that the original version of CALCRIM No. 1111 was complete and accurate.

Citing *People v. Quiroz* (2013) 215 Cal.App.4th 65 (*Quiroz*), appellant maintains that the prosecutor misled or ambushed the defense with an alternative theory. He argues that he did not have time to "ramp up his defense" after the prosecutor announced the constructive touching theory at the conclusion of the prosecution's case-in-chief. Appellant notes that he called his defense witnesses immediately afterwards, and all of his witnesses were finished in the same day. He requests that this court strike his

convictions in count 7, 8 and 9 due to the lack of notice regarding the "constructive touching" theory upon which the prosecution relied.

Appellant's claim lacks merit. First, the trial court was justified in modifying CALCRIM No. 1111. Second, the prosecution was not obligated to disclose its theory of liability in count 9, but it did provide notice with sufficient time for the defense to respond before closing arguments. Finally, any presumed error is harmless.

### 1. The trial court properly modified CALCRIM No. 1111.

In *People v. Austin* (1980) 111 Cal.App.3d 110 (*Austin*), the defendant ordered a minor girl to pull down her pants while he was holding a knife. He said she could make some money. (*Id.* at p. 112.) The girl pulled down her pants, and the defendant paid her a dollar. (*Ibid.*) The *Austin* court concluded that the defendant "was responsible for the touching and removal of the child's pants as surely as if he had done it himself." (*Id.* at p. 115.)

The doctrine of constructive touching was later applied where a defendant, acting as a photographer, instructed or posed some children in a manner that their hands were caused to be placed upon their own genitalia. (*People v. Meacham* (1984) 152 Cal.App.3d 142, 154 (*Meacham*).) *Meacham* held that "the children's touching of their own genitalia at the instigation of appellant was a 'constructive touching' by appellant himself." (*Id.* at p. 153.)

The California Supreme Court has impliedly endorsed the constructive touching doctrine. (See *People v. Memro* (1995) 11 Cal.4th 786, 872 [the disrobing of the victim while alive, actual or constructive establishes a violation of section 288]; *People v. Mickle* (1991) 54 Cal.3d 140, 176 ["the actual or constructive disrobing of a child" when committed for "a sexually exploitative purpose" is presumptively harmful and prohibited by section 288, subdivision (a)].)

In light of these authorities, we agree with respondent that the trial court was correct to modify CALCRIM No. 1111 and instruct the jury on the constructive touching theory. The court was obligated to instruct on the general principles of law raised by the evidence. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) Doe's testimony established that appellant directed her to remove her pants when they were parked inside the vehicle during the R & N Market incident. Thus, it was a question of fact for the jury to resolve regarding appellant's intent. Accordingly, we reject appellant's argument that the court erred in providing the modified instruction under CALCRIM No. 1111.

### 2. *The prosecution provided sufficient notice of its theory.*

A prosecutor does not generally need to elect a theory of guilt. (See *People v. Garrison* (1989) 47 Cal.3d 746, 776, fn. 12 [holding that the complaint does not need to recite a particular theory of guilt].) However, a prosecutor may not mislead a defendant regarding the People's theory and ambush the defense late in the proceedings with an alternative theory of guilt. (*Quiroz*, *supra*, 215 Cal.App.4th at pp. 70–71.)

In *Quiroz*, the defense argued to the jury that the prosecution had shifted its theory of liability from initially claiming the defendant had been the shooter to then claiming the defendant was liable as an aider and abettor. (*Quiroz*, *supra*, 215 Cal.App.4th at p. 69.) On appeal, the defendant asserted that the People had provided him late notice of the new theory, and that his various constitutional rights had been violated. (*Id.* at p. 70.) The appellate court rejected those assertions, holding that a defendant is placed on notice of a new theory of liability either through the evidence presented at the preliminary hearing, or by the People's express mention of the new theory before or during trial sufficiently in advance of closing argument. (*Id.* at pp. 70–71.) In *Quiroz*, the prosecutor had placed the defense on notice about this theory during voir dire, and then about five days before closing arguments. As such, the appellate court held that the prosecution had not ambushed the defense with their aiding and abetting theory. (*Id.* at p. 71.) Moreover, the

65.

*Quiroz* court held that any late notice was harmless. (*Ibid.*) The defendant had "ample time to call witnesses and tailor his closing argument after the People reaffirmed their request for an aiding and abetting instruction." (*Ibid.*) The judgment was affirmed. (*Id.* at p. 81.)

In the present matter, the prosecution disclosed its specific theory of liability in count 9 during the hearing regarding the defense's motion for judgment of acquittal. That hearing occurred in the morning on January 10, 2018. Closing arguments occurred the following afternoon. If it needed Doe to answer more questions about the R & N Market incident, the defense could have sought leave to have Doe testify further. If it needed additional time, the defense could have also requested a short continuance. However, instead of doing any of these things, the defense proceeded to closing arguments and Zerbib asserted to the jury that nothing had happened during the R & N Market incident. The defense conceded that the circumstances surrounding this incident were unusual, but officials had investigated everything and nothing came of it. Zerbib noted it was undisputed that Doe actually had a bruise on her thigh when this incident occurred, which law enforcement could not see without pulling down her pants. Zerbib argued that, just like law enforcement, appellant had simply attempted to see Doe's bruise. Zerbib asserted that no crime had occurred.

*Quiroz* does not establish error in this matter because appellant received adequate notice of the government's theory in count 9 before closing arguments occurred. (See *Quiroz*, *supra*, 215 Cal.App.4th at pp. 70–71.) Appellant was not precluded in presenting his defense, and this record does not show or even reasonably suggest that the prosecution misled him. Instead, the defense was able to argue its position to the jury. As such, appellant's constitutional rights were not violated and reversal is not required. In any event, however, we also conclude that any presumed error was harmless.

### 3.      *Any presumed error was harmless.*

As in *Quiroz*, we conclude that any presumed error was harmless even if the defense received improper late notice of the prosecution's theory in count 9. The defense had ample time to tailor its closing argument after the People made it clear that it believed appellant had made Doe undress herself as the basis for his lewd intent during the R & N Market incident. (See *Quiroz*, *supra*, 215 Cal.App.4th at p. 71.) Moreover, through Doe, the prosecution presented overwhelming evidence that established appellant's guilt. It is apparent that appellant directed Doe to remove her pants in the parked vehicle for his own sexual interests, and he was interrupted when the sheriff's deputy surprised them. No reasonable explanation was provided that demonstrated or even suggested that Doe had a reason to lie regarding her father's actions. The prosecutor argued to the jury that Doe's demeanor in court was of a child who had been forcibly raped by her father.

Appellant attempted to convince the jury that he had not committed any of the charged crimes. The jury rejected the defense position and it clearly found Doe's testimony credible. Based on the totality of this record, we can declare that, even if a presumed federal constitutional error occurred, it is beyond any reasonable doubt that the error did not contribute to the verdict. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) The prosecution overwhelmingly established appellant's guilt for all of the charged crimes, including those during the R & N Market incident. Therefore, reversal is not warranted of appellant's convictions in count 7, 8 and/or 9, and this claim fails.[18]

---

[18]      Appellant cites a series of opinions that stand for the proposition that adequate notice of a prosecution theory may come from the evidence presented at the preliminary hearing. (See, e.g., *People v. Jenkins* (2000) 22 Cal.4th 900, 1024; *People v. Scott* (1991) 229 Cal.App.3d 707, 717.) We need not analyze those opinions because the notice provided to appellant in this matter came before closing arguments, and the prosecution did not mislead or ambush the defense. (See *Quiroz*, *supra*, 215 Cal.App.4th at pp. 70–71.) In any event, even if appellant received improper late notice, it is beyond any reasonable doubt that any presumed error was harmless.

**IX.     Substantial Evidence Supports the Conviction In Count 7.**

In count 7, appellant was convicted of kidnapping a child under the age of 14 years based on a false promise or misrepresentation in violation of section 207, subdivision (b).  The verdict form referred to this crime as part of the R & N Market incident.  For this conviction, appellant was sentenced to a consecutive subordinate determinate term of three years four months.

Appellant argues that his conviction in count 7 must be reversed for insufficient evidence.

**A.     *Standard of review*.**

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could make the necessary finding beyond a reasonable doubt.  The evidence must be reasonable, credible and of solid value.  We presume every inference in support of the judgment that the finder of fact could reasonably have made.  We do not reweigh the evidence or reevaluate witness credibility.  We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding.  (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)  The standard of review is the same when the conviction is based primarily on circumstantial evidence.  (*People v. Clark* (2016) 63 Cal.4th 522, 625.)

**B.     *Background*.**

The conviction in count 7 stemmed from the incident on July 1, 2011, wherein appellant had asked Doe to drive to the R & N Market with him.  Appellant did not promise her anything, but she testified at trial that she "most likely" would have received something when she got to the store.  She willingly went with appellant.  Instead of going to the market, however, appellant drove her to an isolated location near an orchard.  He parked and directed her to remove her pants, which she did.

### C.    *Analysis.*

Appellant contends that the prosecution failed to establish that (1) he took Doe for an illegal purpose; (2) he tricked her into going with him to the market; and/or (3) he had any lewd intent.  He maintains that this conviction is based only on supposition, and he had a parental right to examine Doe for a bruise inflicted by Doe's mother, his then estranged wife.  He requests that this court reverse his kidnapping conviction in count 7.

We disagree that reversal is required.  Appellant's assertions are wholly without merit and substantial evidence supports this conviction.

A father ordinarily cannot kidnap his own child when he is entitled to custody. (*People v. Senior* (1992) 3 Cal.App.4th 765, 781.)  However, a father may be liable for kidnapping if he exercises custodial rights for an illegal purpose.  (*Ibid.*)  In relevant part, section 207, subdivision (b), makes it a crime when a person, for the purpose of committing a lewd act, uses misrepresentation or false promises to convince a child under the age of 14 years to go to another part of the same county.

In the present matter, the prosecutor argued to the jury that appellant took Doe after misrepresenting to her where they were going.  Reasonable inferences may be drawn from this record that appellant took Doe to the orchard for a lewd purpose.  Doe thought she would get a toy or candy when appellant asked her to go to the market. Instead of going to the market, however, appellant parked in a rural area and he told Doe to remove her pants.  She told the jury that she was "confused" and "scared" when her father told her to take off her pants.  She said that his request was not "normal" for a father to ask of his daughter.

Doe testified that, when they were driving just before this incident occurred, appellant had not asked her to show him the bruise.  Instead, he just told her to remove her pants.  The deputy saw very strange behavior when he arrived on the scene.  Both appellant and Doe were positioned out of sight inside the vehicle, and both of their heads popped up.  Doe immediately moved her body in a way that suggested she was putting on

pants. The circumstantial evidence strongly suggests that appellant was trying to hide his behavior with his daughter, and he could not provide a reasonable explanation why he was allegedly checking his daughter's bruise in a rural area and not at home. Law enforcement discovered that both seats in appellant's vehicle had been in a reclined position when the deputy surprised them.

Appellant notes it is undisputed that Doe actually had a bruise on her upper leg when this crime occurred. He raises numerous arguments in an effort to show that an inference may be drawn from the record that he was lawfully exercising his parental right to examine Doe for an innocent reason. Those arguments are unpersuasive.

From all of the trial evidence, a reasonable jury could have concluded beyond any reasonable doubt that appellant enticed Doe or made a false promise that they were going to the market, but, instead, he intended to drive her to that isolated location with the lewd intent to gratify himself, and he did gratify himself. Although appellant can point to other possible interpretations that may be drawn from the record regarding his intent, that does not establish an insufficiency of the evidence for this conviction. Rather, the jury had ample evidence to find appellant guilty in count 7 beyond any reasonable doubt, and we will not reverse the judgment merely because the evidence could be reconciled with a contrary finding. (See *People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.) Substantial evidence supports a kidnapping conviction under section 207, subdivision (b), and this claim is without merit.

## X.    Substantial Evidence Supports the Conviction in Count 9.

In count 9, appellant was convicted of committing a lewd and lascivious act upon Doe in violation of section 288, subdivision (b)(1). This was part of the R & N Market incident. Appellant was sentenced to an upper term of 10 years for this conviction, which was doubled based on his prior strike.

During closing argument, the prosecutor asserted that appellant caused Doe to touch herself when he ordered her to remove her pants. According to the prosecutor, appellant intended to gratify himself, and Doe was scared. Doe did not know what was happening. The prosecutor urged the jury to find appellant guilty in count 9.

Appellant argues that this conviction must be reversed due to insufficient evidence. He contends that Doe did not describe any touching when she was with him in the vehicle in the orchard. He asserts that a constructive touching theory lacks evidentiary support because Doe was not ordered to touch herself in a sexual way, and she was simply asked to remove her pants in the context of a discussion about a bruise that was not otherwise visible. Appellant also asserts that nothing shows force and/or duress. He requests that this court reverse his conviction in count 9.

We disagree that reversal is warranted. Section 288, subdivision (a), makes it a felony whenever a person willfully and lewdly commits any lewd or lascivious act upon a child who is under the age of 14 years with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child. Various appellate courts have upheld a constructive touching theory as a basis to find a lewd and lascivious act. (*Meacham*, *supra*, 152 Cal.App.3d at p. 153; *Austin*, *supra*, 111 Cal.App.3d at p. 115.) The California Supreme Court has impliedly endorsed the constructive touching doctrine. (See *People v. Memro*, *supra*, 11 Cal.4th at p. 872; *People v. Mickle*, *supra*, 54 Cal.3d at p. 176.)

Section 288, subdivision (b), imposes a sentencing enhancement if the person who commits the lewd act uses force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person. For purposes of this statute, the word "duress" means a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or (2) acquiesce in an act to which one otherwise would not have submitted. (*People v. Veale* (2008) 160

71.

Cal.App.4th 40, 46.) The entire circumstances, including the victim's age and her relationship to the defendant, are factors to be considered in examining the existence of duress. (*Ibid.*)

Here, appellant's jury was instructed on the definition of duress, which was consistent with the definition summarized above. A reasonable jury could have concluded beyond any reasonable doubt that appellant compelled Doe to remove her pants for his own sexual gratification, and she did so because of duress. Doe was only 10 years old when this incident occurred, making her far too young to resist him. Appellant drove her to a rural location near an orchard. This incident ended when a deputy sheriff unexpectedly drove up and surprised appellant, who popped up from the front passenger seat, which was fully reclined. The deputy saw Doe "shimmying her shoulders and torso" as if she were putting on pants. Appellant told her not to say anything, and he made a "mean face" at her. Doe testified that she had been scared. Appellant could not provide a reasonable explanation to the deputy why Doe's pants had been pulled down in a rural location.

Based on the entire circumstances, the jury could have reasonably found appellant guilty of violating section 288, subdivision (b). Appellant ordered Doe to remove her pants while they were parked in a rural location. Given her very young age and his authority over her, the jury could have reasonably concluded that Doe felt compelled to comply based on duress. Moreover, the totality of the evidence amply supports the jury's conclusion that appellant directed Doe to remove her pants for his own sexual gratification. Indeed, the evidence strongly suggests that appellant would have continued his lewd act had the deputy not interrupted him.

Appellant cites *People v. Espinoza* (2002) 95 Cal.App.4th 1287 (*Espinoza*). This opinion does not assist him. In *Espinoza*, the defendant molested his 12-year-old daughter on multiple occasions in her bedroom in the hours just after midnight. (*Espinoza*, *supra*, at pp. 1292–1293.) The appellate court held that insufficient evidence

supported a finding of duress. According to *Espinoza*, it was not enough that the defendant was the victim's father and larger than her, or that she was afraid of him and had a limited intellectual level. (*Id.* at p. 1321.) Instead, duress required evidence showing that the victim's participation was impelled, at least in part, by an implied threat. (*Ibid.*) No evidence showed that the defendant's lewd acts and attempt at intercourse were accompanied by any threats. While it was clear that the victim was afraid of her father, no evidence was introduced to show that this fear was based on anything the defendant had done other than to continue to molest her. According to *Espinoza*, it would be "circular reasoning to find that her fear of molestation established that the molestation was accomplished by duress based on an implied threat of molestation." (*Ibid.*)

Espinoza is distinguishable from the present matter. Unlike what occurred in *Espinoza*, appellant did not approach Doe in her bedroom but, rather, drove her to a rural area and told her to remove her pants. Doe testified that she was scared during this incident because appellant "is a scary person." She later testified that she was scared because appellant had been "violent towards my mom, and my brothers, and me."

Doe was about two years younger than the victim in *Espinoza*. Because of Doe's younger age, she was more susceptible to being coerced through fear, and she was even more susceptible to appellant's position of authority over her. Doe expressed a clear concern about appellant's past acts of violence committed on her, her mother, and her brothers. *Espinoza* does not establish that reversal is required, and sufficient evidence exists in this record to support the jury's conviction in count 9. Appellant's arguments are unpersuasive, and we will not reverse this conviction.

## XI. Instructional Error did not Occur with CALCRIM No. 1193.

Appellant argues that CALCRIM No. 1193, which instructs a jury about CSAAS, is legally erroneous because it permits jurors to find guilt through this syndrome. He

asserts that this instruction violates California law, it deprived him of a fair trial, and it reduced the prosecution's burden of proof.

### A. Standard of review.

Instructional errors are questions of law, which we review de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569–570; *People v. Jandres* (2014) 226 Cal.App.4th 340, 358.) We must ascertain the relevant law and determine whether the given instruction correctly stated it. (*People v. Kelly*, *supra*, 1 Cal.4th at pp. 525–526.)

We review a challenged jury instruction "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.) In that context, we must determine if it is reasonably likely the jurors understood the instruction as appellant suggests. (*People v. Nem* (2003) 114 Cal.App.4th 160, 165.) We should consider the language of the instruction, the entire trial record, and the arguments of counsel. (*Ibid.*)

### B. Analysis.

Our Supreme Court has noted that expert testimony about CSAAS is needed to enlighten jurors regarding commonly held misconceptions about child sexual abuse, and to explain why abused children may engage in apparent self-impeaching behavior. (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1301.) A vast majority of courts approve of such expert testimony as rebuttal evidence. (*Ibid.*)

CALCRIM No. 1193 is based on *Bowker*, *supra*, 203 Cal.App.3d 385. The *Bowker* court held that a jury "must be instructed simply and directly" that an expert's testimony regarding CSAAS "is not intended and should not be used to determine whether the victim's molestation claim is true. The jurors must understand that CSAAS research approaches the issue from a perspective opposite to that of the jury. CSAAS *assumes* a molestation has occurred and seeks to describe and explain common reactions

74.

of children to the experience. [Citation.] The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*Bowker*, *supra*, 203 Cal.App.3d at p. 394.)

In the present matter, the court instructed the jurors that they had heard testimony from Urquiza regarding CSAAS, and his testimony was "not evidence" that appellant had "committed any of the crimes" in this matter. The jurors were instructed that they could consider this evidence "only in deciding whether or not" Doe's conduct "was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." This language substantially mirrors the form language appearing in CALCRIM No. 1193.

Appellant concedes that this instruction correctly stated that Urquiza's testimony was not evidence that he (appellant) had committed any of the charged crimes. However, appellant asserts that the "very next sentence" holds a contradiction because it told the jurors they could consider this evidence in evaluating Doe's credibility. Appellant maintains that it is impossible to use CSAAS testimony to evaluate Doe's credibility, when she provided the only evidence that he was guilty. He argues that this instruction "eviscerated any limiting effect" it had in telling the jurors that the CSAAS testimony was not evidence he had committed the charged crimes.

According to appellant, CALCRIM No. 1193 has three flaws. First, it is impossible to separate a complaining witness's credibility from whether their molestation allegations are true. Appellant argues that a juror who used the CSAAS testimony to evaluate Doe's credibility would necessarily use that same evidence to evaluate whether appellant committed the charged crimes.

Second, appellant notes that this instruction has a double negative, which he asserts is confusing. He argues that the phrase "not inconsistent with" means "consistent with." Thus, appellant contends that jurors could use Urquiza's testimony to make a

diagnosis and conclude that, because Doe's conduct shows she suffered from CSAAS, her claims of sexual abuse must be true.

Third, appellant claims that this instruction is not impartial, and it is fundamentally argumentative because it expressly permits jurors to use CSAAS evidence to determine if the complaining witness's behavior is consistent with that of a sexual abuse victim, but it ignores a defense inference that the same behavior might suggest falsity. Appellant argues that, without this instruction, a juror may have viewed Doe's behavior in a very different light. Doe delayed reporting the abuse, she was inconsistent and vague about some details, and she appeared happy. Appellant contends that the trial evidence supported an inference that Doe was lying to help her mother in a possible custody dispute. According to appellant, CALCRIM No. 1193 only favors the prosecution's narrative, and it does not offer jurors the option of rejecting CSAAS's explanation for Doe's conduct.

Appellant relies on *People v. Housley* (1992) 6 Cal.App.4th 947 (*Housley*). In *Housley*, Division Two of the First District Court of Appeal, held that, "because of the potential for misuse of CSAAS evidence, and the potential for great prejudice to the defendant in the event such evidence is misused, it is appropriate to impose upon the courts a duty to render a sua sponte instruction limiting the use of such evidence. Accordingly, in all cases in which an expert is called to testify regarding CSAAS we hold the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housley*, *supra*, 6 Cal.App.4th at pp. 958–959.) *Housley* concluded that such a limiting instruction had not been given in its matter, but the instructional error was harmless. The CSAAS expert had twice told the jury that she had not met the victim and had no knowledge of the case. The expert's testimony "was couched in general terms, and

described behavior common to abused victims as a class, rather than any individual victim." (*Id.* at p. 959.) The appellate court concluded that it was unlikely the jury interpreted the expert's statements as support for the victim's credibility. (*Ibid.*) Moreover, other witnesses testified about why the victim had retracted her claims of molestation. The *Housley* court determined it was not reasonably probable the defendant would have received a more favorable verdict if an appropriate limiting instruction had been given. (*Ibid.*)

Appellant contends that, because his jurors were told that they could consider Urquiza's testimony in evaluating Doe's credibility, it is "almost certain" the jurors would have utilized the CSAAS testimony in an impermissible way to find him guilty.

At least two published opinions have already disposed of arguments similar to those which appellant raises here. In *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*), Division Six of the Second Appellate District stated that a reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use the expert's testimony to determine that the minor victim's behavior does not mean she lied when she said she was abused. (*Gonzales*, *supra*, at p. 504.) A jury would understand it could not use the expert's testimony to conclude that the child was, in fact, molested. (*Ibid.*) CSAAS evidence merely neutralizes the victim's apparently self-impeaching behavior. (*Ibid.*) "Thus, under CALCRIM No. 1193, a juror who believes [the expert's] testimony will find both that [the child's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Ibid.*)

In *People v. Munch* (2020) 52 Cal.App.5th 464 (*Munch*), Division Six of the Second Appellate District cited its prior *Gonzales* opinion with continued approval. (*Munch*, *supra*, 52 Cal.App.5th at p. 474.) *Munch* rejected arguments that CALCRIM No. 1193 reduced the prosecution's burden of proof, or that the jurors may have improperly used it to find guilt. (*Munch*, *supra*, at p. 474.)

Appellant argues that *Gonzales* is not convincing authority. According to appellant, *Gonzales* did not address the double negative appearing in CALCRIM No. 1193, and *Gonzales* "glossed over" the concern that a complaining victim's credibility cannot be separated from establishing a defendant's guilt. Moreover, appellant contends that *Gonzales* is factually distinguishable from the present matter. Appellant maintains that Urquiza responded to hypotheticals and provided conclusions that included facts similar to this case.

We reject all of appellant's arguments. CSAAS was admissible to show that Doe's reactions were not inconsistent with having been molested. (See *Bowker*, *supra*, 203 Cal.App.3d at p. 394.) Appellant's jury was explicitly instructed that Urquiza's testimony could not be used as evidence that appellant was guilty, but only in evaluating Doe's credibility. Urquiza himself told the jury that CSAAS is not a diagnostic tool and its purpose was to educate. Urquiza made it clear that a presumption exists with CSAAS that the child has been sexually abused, and it describes "common characteristics of that child." However, the jury learned that this syndrome has no applicability if a child has not been sexually abused.

Through other instructions, the jury was informed that appellant was presumed innocent, and the prosecution bore the burden to prove his guilt beyond a reasonable doubt. For each of the charged crimes, the jurors were told that the prosecution had to prove each of the required elements, which were provided. The jurors were told that they could disregard Urquiza's expert testimony, and they were not required to accept it as true or correct.

During closing argument, the prosecutor informed the jury that Urquiza was not there to tell them whether he believed Doe. Instead, his testimony was about his prior treatment of abused children, and the trends that have been observed. The prosecutor asked the jury to consider Urquiza's testimony when considering how Doe handled everything and appeared emotionally in light of appellant's criminal behavior with her.

78.

Zerbib reminded the jurors that Urquiza said the purpose of his testimony was not to diagnose or say that abuse had happened. According to Zerbib, the CSAAS evidence was to help explain some of Doe's behavior if she had been abused. Zerbib, however, argued that the prosecution had not proven beyond a reasonable doubt that the alleged molestation had occurred.

Based on our independent review, the instruction which appellant's jury received pursuant to CALCRIM No. 1193 correctly stated the law. The jurors were explicitly told that this evidence could not be used to establish appellant's guilt. It is not reasonably likely the jury would have applied CALCRIM No. 1193 in an impermissible way. The jurors learned that CSAAS evidence is not a diagnostic tool, but it provided an explanation into why Doe may have engaged in apparently self-impeaching behavior. Appellant's jury would not have reasonably believed it could use Urquiza's testimony to conclude that Doe was in fact molested. Accordingly, we reject appellant's arguments that he suffered an unfair trial or that the prosecution's burden of proof was lowered. This record does not show that instructional error occurred, and this claim fails.[19]

## XII.    Substantial Evidence Supports the Conviction in Count 1.

In count 1, the jury convicted appellant of intercourse with Doe when she was 10 years old or younger in violation of section 288.7, subdivision (a). This was the living room incident. Appellant was sentenced to prison for 50 years to life for this conviction, plus an additional consecutive five years for his prior serious felony conviction.

Appellant asserts that insufficient evidence supports this conviction. He argues that substantial evidence did not establish that Doe was 10 years old when this crime occurred, and he seeks reversal of this conviction.

---

[19]    Because instructional error did not occur, we do not address appellant's arguments regarding prejudice.

## A.	Background.

At the conclusion of the prosecution's case-in-chief, the defense sought a judgment of acquittal (§ 1118.1).  In part, appellant asked the court to dismiss counts 1 and 4 on the grounds that no evidence showed that Doe was 10 years old or younger when those offenses were alleged to have occurred.[20]  The prosecutor admitted that the evidence showed Doe was older than 10 years old at the time the conduct alleged in count 4 had occurred.  However, the prosecutor noted that Doe had testified that she was either 10 or 11 years old during the alleged incident charged in count 1.  The court granted appellant's motion as to count 4, and it denied it for all remaining counts.

On rebuttal, the prosecutor recalled Doe to testify.  Doe told the jury that she was 10 years old during the R & N market incident.  The prosecutor then questioned her about her age during the living room incident, which is the basis for the charge in count 1.  Doe testified that she thought she was still 10 years old when that incident occurred because she had summer school that year.  Her birthday is in June and she was in the fifth grade.  She testified that she remembered because her summer school teacher had been "on [her]" because her grades had started to drop.  Doe answered "Yes" when the prosecutor asked whether Doe had remembered that she was 10 years old the first time appellant "actually put his private part inside your private part?"

During cross-examination, Doe confirmed that she was 10 years old during the living room incident, and she said she was "[p]ositive" about that.  Doe acknowledged that, in her trial testimony the day before, she had stated that she could have been 10 or 11 years old when this incident happened.  She explained that she had "sat down and calendared" how old she was each time she had entered a new grade.  Because her birthday was in June, she testified that she started summer school around 10 years of age,

---

[20]	Count 4 had alleged that appellant "engaged in sexual intercourse and sodomy" with Doe, who was 10 years of age or younger, between June 4, 2011, and June 3, 2012, in violation of section 288.7, subdivision (a).

and she was 10 years old when she entered the fifth grade. She claimed that she did this calculation on her own without knowing that she was going to testify again during rebuttal. She confirmed that, despite previously saying she was maybe 10 or 11 years old during the living room incident, it was her testimony that she had been 10 years old at the time.

## B. Analysis.

Appellant argues that Doe's testimony does not amount to substantial evidence because she provided contradictions regarding her age when the living room incident occurred. Appellant notes that, during her MDIC interview and her earlier trial testimony, Doe had believed she was 10 or 11 years old. During her rebuttal testimony, Doe stated that she "thinks" she was 10 years old when this occurred, and appellant argues that such testimony equals a "maybe." Appellant asserts that Doe did not connect the living room incident to her summer school attendance. He maintains that Doe's testimony is legally insufficient to support the conviction in count 1. We disagree.

In *United States v. Kenyon* (8th Cir. 2007) 481 F.3d 1054 (*Kenyon*), an opinion which appellant cites, the defendant was convicted of four counts of aggravated sexual abuse of a child. (*Kenyon*, *supra*, 481 F.3d at p. 1058.) For one count, the victim testified that the defendant had "maybe" put his penis in her mouth twice, but she did not know. (*Id.* at p. 1068.) At the conclusion of her testimony, the trial court directly asked the victim if she knew whether the defendant had committed one or two acts of oral copulation, and the victim had responded, "No." (*Ibid.*) The federal appellate court held that this was insufficient evidence to support two convictions. The victim had been unable to say that the oral copulation had occurred on two separate occasions. Her testimony that "maybe" it occurred twice, which was uncorroborated by any independent evidence of such encounters, did not represent substantial evidence. (*Ibid.*) The court reversed one of the defendant's convictions. (*Ibid.*)

81.

*Kenyon* does not assist appellant. A conviction under section 288.7, subdivision (a), requires proof that a person 18 years of age or older engaged in sexual intercourse or sodomy with a child who was 10 years of age or younger. Although Doe initially stated she was either 10 or 11 years old when the living room incident occurred, she later clarified in rebuttal testimony that she was 10 years old when this crime happened. She said she was positive that she had been 10 years old, and she explained how she had calculated her age. During closing argument, the prosecutor asserted to the jury that Doe was 10 years old when this crime occurred because Doe had ultimately remembered her age from summer school.

Doe's testimony was sufficient by itself to establish her age. (See Evid. Code, § 411 [the direct evidence of one witness is sufficient for proof of any fact].) Although appellant can point to credibility concerns surrounding Doe's testimony regarding her age when the living room incident occurred, we will not disturb the jury's finding in count 1 because we will not reweigh her credibility. (See *People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.) Doe's testimony was not demonstrably false. Thus, it was the jury's exclusive role to resolve this factual dispute. (*People v. Hovarter* (2008) 44 Cal.4th 983, 996; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.) Unlike the situation in *Kenyon*, wherein the victim could not testify at all to establish a required fact, Doe was ultimately positive that she was 10 years old when the living room incident occurred. *Kenyon* is distinguishable and it does not establish error in this matter.

In rendering its verdict in count 1, it is apparent that the jury found Doe's testimony credible and accepted the prosecutor's argument. Doe's testimony was reasonable, credible and of solid value. Thus, substantial evidence supports the conviction in count 1, and this claim fails.

## XIII. Substantial Evidence Supports the Conviction in Count 8.

In count 8, the jury found appellant guilty of attempting to prevent and dissuade Doe from making a report of her victimization to a peace officer in violation of section 136.1, subdivision (b)(1). This was the R & N Market incident.

Appellant contends that insufficient evidence supports this conviction. According to appellant, no charges were pending at the time this incident occurred, and there was no threat of a criminal prosecution. He argues that nothing shows he intended to violate section 136.1, subdivision (b)(2).

We reject appellant's arguments. As an initial matter, appellant incorrectly contends he was convicted of section 136.1, subdivision (b)(*2*). To the contrary, he was convicted of violating subdivision (b)(*1*). Section 136.1, subdivision (b)(1), makes it a crime, in relevant part, if a person attempts to prevent or dissuade a criminal victim from reporting that crime to law enforcement.

At trial, Doe testified that she went with appellant believing they were going to the R & N Market. Instead, appellant drove her to a rural area and parked their vehicle. He got into the passenger seat and she got into the driver's side seat. He told her to remove her pants, which she did. A short time later, a deputy interrupted them, and it appeared that Doe was pulling on pants. The deputy asked to speak with appellant, who told Doe not to say anything. Doe testified that appellant made a "mean face" at her around this time. She said she was scared.

Based on Doe's testimony, a reasonable jury could have found beyond any reasonable doubt that appellant attempted to dissuade her from reporting her victimization to the deputy. (§ 136.1, subd. (b)(1).) Doe's testimony was sufficient by itself to establish appellant's guilt. (See Evid. Code, § 411 [the direct evidence of one witness is sufficient for proof of any fact].) Although appellant can point to credibility concerns surrounding Doe's testimony, we will not disturb the jury's verdict. (See *People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.) It was the jury's exclusive role to resolve

all factual disputes.  (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 996; *People v. Cudjo*, *supra*, 6 Cal.4th at p. 609.)  This record amply supports the jury's conviction in count 8.  Appellant's arguments are wholly without merit, and we will not reverse this conviction.

**XIV.  Appellant has Forfeited any Claim that the First Amended Information Failed to Allege a Correct Date Range for the Sodomy Charges; In any Event, Appellant's Due Process Rights were not Violated and no Prejudice Occurred.**

The jury convicted appellant of two charges involving sodomy.  In count 5, appellant was convicted of sodomy with Doe in violation of section 286, subdivision (c)(2)(B).  At trial, Doe testified that appellant sodomized her when she was 13 years old.  She agreed on cross-examination that this would have occurred in late 2014.  The court sentenced appellant to the upper term of 13 years, which was doubled because of his prior strike.

In count 6, appellant was convicted of committing a lewd and lascivious act (sodomy) upon Doe in violation of section 288, subdivision (b)(1).  The court stayed the sentence for this conviction because it occurred from the same transaction and occurrence as the sodomy in count 5.

Appellant claims that the prosecution failed to produce sufficient evidence during the preliminary hearing regarding the sodomy charges alleged in counts 5 and 6.  He asserts that his due process rights were violated and he was unable to prepare his defense adequately.  He seeks reversal of his convictions in count 5 and 6.

> ### A.  *Background.*

> #### 1.  *The original criminal complaint.*

On May 6, 2016, the prosecution filed its criminal complaint against appellant in this matter.  In relevant part, it alleged the three following charges involving sodomy.  All three of these charges alleged that the criminal behavior occurred between June 4, 2011, and June 3, 2012.

1. In count 1, sexual intercourse and sodomy with Doe in violation of section 288.7, subdivision (a).

2. In count 4, sexual intercourse and sodomy with Doe in violation of section 288.7, subdivision (a).

3. In count 5, an act of sodomy with Doe in violation of section 286, subdivision (c)(2)(B).

### 2. *The relevant testimony from the preliminary hearing.*

The preliminary hearing occurred on May 19, 2016. Before testimony was received, the prosecutor advised the court that count 1 was part of the living room incident. Counts 4 and 5 were alternative counts, and they were part of "the sodomy incident."

At the preliminary hearing, Detective Fausnett testified that he had personally interviewed Doe and he had observed her MDIC interview. Doe had reported that appellant, her father, began improperly touching her starting approximately in 2011 when she was 10 years old. That touching evolved into intercourse wherein he placed his penis inside her vagina. Appellant had ejaculated. Doe had reported that appellant had engaged in these activities with her "almost every night." She stated it had happened "over 50 times." Regarding sodomy, Doe had reported that appellant had also sodomized her, but she did not give an exact time or an instance when it happened.

Fausnett testified that Doe lived first at a residence in Kings County from 2009 until 2011. She then lived at a different residence in Kings County from 2011 until 2014.

During her MDIC interview, Doe had stated that the incidents with her father occurred between 2011 and 2014. The first incident had occurred while they were living at that first residence. The living room incident had occurred while living at the second residence. Doe had reported that the final incident with appellant occurred in late 2014.

### 3.     *The court's ruling at the preliminary hearing.*

At the conclusion of the preliminary hearing, the prosecution moved to amend the dates of the charges to conform to proof.  The new date range was June 4, 2009, to June 3, 2014, for all alleged crimes with the exception of those involved in the R & N Market incident.

Zerbib asked the court to dismiss the sodomy charge alleged in count 5, asserting that he did not recall hearing testimony regarding an act of sodomy involving Doe.  For all other counts, the defense submitted the matter.

The court did not specifically respond to Zerbib's request, but it held appellant to answer for all counts, with the exception of one count that is not relevant to the present discussion.[21]  The court found sufficient cause to believe that appellant had committed the charged crimes.

### 4.     *The charging documents after the preliminary hearing.*

Following the preliminary hearing, the prosecution filed an information on June 3, 2016.  Even though the prosecutor had orally amended the dates of the relevant charges to conform to proof following the preliminary hearing, the information did not reflect those amended dates.  Instead, the date range previously alleged in the complaint (June 4, 2011, through June 3, 2012) was again alleged in the information.

On November 13, 2017, the prosecution filed a first amended information.  The prior date range appearing in both the complaint and the information again was used in the first amended information.

### B.     *Analysis.*

Appellant maintains that no evidence from the preliminary hearing expressly or impliedly established when an act of sodomy occurred.  He claims it is improper to assume it occurred in the time frame given under the generic label of abuse.  He further

---

[21]     The trial court dismissed count 13 following the preliminary hearing.  This count had alleged an assault with intent to commit rape.

argues that Doe's trial testimony did not establish an act of sodomy within the time frame charged in the first amended information. He contends that he was misled because the charging documents after the preliminary hearing did not allege an expanded date range for the sodomy charges. He argues it was not until Doe testified at trial that it became apparent when the alleged sodomy actually occurred (i.e., during the final incident in 2014), which was well after the alleged date range of June 4, 2011, through June 3, 2012. He asserts he was unable to prepare an adequate defense.

We reject appellant's claim that his due process rights were violated. As an initial matter, this claim is forfeited. In any event, this claim fails on its merits and prejudice did not occur.

### 1. *This claim is forfeited.*

Respondent argues that appellant has forfeited this claim in failing to dispute the pleading variance at trial. Appellant does not dispute respondent's position that the defense did not raise this issue during the trial. Instead, appellant contends that he was not obligated to raise this issue because it was the prosecutor who was required to conform the information to the proof.

We agree with respondent that appellant has forfeited this claim. A defendant cannot raise a discrepancy for the first time on appeal regarding the variance between the pleading and the trial evidence if the defendant was not injured or prejudiced by the variance. (*People v. Amy* (1950) 100 Cal.App.2d 126, 128.) Here, appellant did not raise this issue in the trial court. Further, as we explain below, appellant was not prejudiced by this variance. Accordingly, this claim must be deemed forfeited. In any event, this claim also fails on its merits.

### 2. *This claim fails on its merits.*

Due process requires a criminal defendant to be advised of the pending charges so that he has a reasonable opportunity to prepare and present his defense. (*People v. Jones*

(1990) 51 Cal.3d 294, 317.)  A defendant must be prepared to defend against all offenses of the type alleged in the information which are established at the preliminary hearing to have occurred within the time frame pleaded in the information.  (*Ibid*.)  However, it is the transcript of the preliminary hearing, rather than the information, that gives notice of the particulars of an offense.  (*Id.* at p. 312.)

Here, the evidence at the preliminary hearing was sufficient to put appellant on notice regarding the counts that allegedly involved sodomy.  The testimony established that all of appellant's sexual contact with Doe occurred between 2011 and 2014.  Doe reported that the sexual contact happened almost every night, and over 50 times, during that date range.  Doe also reported that sodomy had occurred.  At the conclusion of the preliminary hearing, the prosecution made it clear that it was amending the relevant criminal allegations to a date range between 2009 and 2014.

Based on the evidence presented at the preliminary hearing, appellant was on notice that he had to be prepared to defend against alleged sodomy between 2011 and 2014.  Appellant was not entitled to notice of the specific time or place of each offense, so long as it occurred within the applicable limitation period.  (See *People v. Jones*, *supra*, 51 Cal.3d at p. 317.)  This record does not demonstrate a due process violation.  In any event, even if we presume that error occurred, this record does not demonstrate prejudice regarding the variance between Doe's testimony and the dates alleged in the first amended information for counts 5 and 6.

### 3. *Prejudice is not shown.*

The time period alleged in the first amended information was not material to the charges in counts 5 and 6, which only required proof that Doe was under 14 years of age.  (See §§ 286, subd. (c)(2)(B), 288, subd. (b)(1).)  Appellant's trial defense was that he never molested Doe at any time, and the prosecution failed to prove any of the charges beyond a reasonable doubt.  Appellant did not raise an alibi defense, which would have

made the alleged dates particularly relevant. When a specific alibi defense is not raised, the prosecution need only prove a criminal act was committed before the filing of the information and within the period of the statute of limitations. (*People v. Osuna* (1984) 161 Cal.App.3d 429, 433.)

This record does not demonstrate or even reasonably suggest that appellant was harmed by the variance between the dates alleged in the first amended information and the trial evidence. Accordingly, this claim is without merit, and reversal of the sodomy convictions in counts 5 and 6 is not warranted.

## XV. Cumulative Error did not Occur.

Appellant raises a claim of cumulative error. He contends that, based on some of the errors identified above, he suffered a fundamentally unfair trial and a new trial is required. We disagree.

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) A claim of cumulative error is essentially a due process claim. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) The test is whether the defendant received a fair trial. (*Ibid.*)

We reject appellant's claim of cumulative error because we have denied all of his individual claims. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].) Taking all of appellant's claims into account, we are satisfied that he received a fair adjudication regarding his guilt for Doe's ongoing sexual abuse. A new trial is not required, and this claim fails.

## XVI. The Sentences in Counts 14 and 17 Must Be Stayed.

In count 14, appellant was convicted of violating Doe's personal liberty (i.e., false imprisonment) through violence, menace, fraud and deceit in violation of section 236.

This was part of the choking incident. He was sentenced to a consecutive subordinate determinate term of one year four months.

In count 17, appellant was again convicted of violating Doe's personal liberty (i.e., false imprisonment) through violence, menace, fraud and deceit in violation of section 236. This was part of the final incident. He was sentenced to a consecutive subordinate determinate term of one year four months.

The parties agree that the sentences imposed in counts 14 and 17 must be stayed pursuant to section 654 because these crimes were not divisible from other crimes that occurred at the same time. We agree with the parties.

Section 654 bars multiple punishments for the same criminal act or omission. (§ 654, subd. (a); *People v. Correa* (2012) 54 Cal.4th 331, 337.) The intent and objective of the defendant must be examined to determine whether criminal conduct was divisible and gave rise to more than one act within the meaning of section 654. (*People v. Jackson* (2016) 1 Cal.5th 269, 354.) When all offenses were the product of one criminal objective, a defendant may be punished for any one offense but not for more than one. (*Ibid.*)

In this matter, the false imprisonment conviction in count 14 was part of the choking incident wherein appellant held Doe down and assaulted her by placing his hands around her neck. Doe did not black out or lose consciousness. Her clothes were on during this incident, and he did not have sex with her.

The false imprisonment conviction in count 17 occurred during the final incident when appellant called Doe to her bedroom and he locked the door behind her. He told her to lie down on the carpet. He pulled down her pants and he pushed his penis inside her "butt hole." She was crying and it hurt. Appellant eventually said, "[F]ine," and he told her to lie on her back. He then had vaginal sex with her. She was in pain.

Respondent concedes that, in both instances, the false imprisonment that Doe suffered was incidental to the other crimes that occurred during the choking incident and

the final incident. Respondent's concession is appropriate. The false imprisonment during the choking incident occurred because appellant held Doe down and choked her. The false imprisonment during the final incident occurred when appellant locked the bedroom door and told Doe to lie down so he could have sex with her. Because this last false imprisonment was used to facilitate the final act of sex, section 654 is applicable. (See *People v. Latimer* (1993) 5 Cal.4th 1203, 1216 [holding that sentence on kidnapping conviction had to be stayed because it was committed to facilitate other sex crimes].) The record does not demonstrate that appellant harbored multiple criminal intents or objectives during either the choking or the final incidents. Thus, the sentences on the false imprisonment counts should be stayed under section 654. (See *People v. Jackson*, *supra*, 1 Cal.5th at p. 354.)

Appellant contends that a remand is required for resentencing. We disagree.

When an appellate court strikes a portion of a sentence, a remand for a full resentencing is generally appropriate so the trial court can exercise its sentencing discretion following the changed circumstances. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) However, a remand is unnecessary when the trial court originally imposed the maximum possible sentence. (*Id.* at p. 896, fn. 15; *People v. Lopez* (2019) 42 Cal.App.5th 337, 342.)

Here, the trial court imposed the maximum possible sentence against appellant. In all instances, the court imposed an upper determinate term when allowed, and all terms were consecutive. Thus, staying the sentences for the convictions in counts 14 and 17 will not give the trial court any new sentencing discretion. As such, a remand is not warranted in this situation. We will direct the trial court to modify the applicable determinate abstract of judgment to reflect that the sentences imposed in counts 14 and 17 are stayed pursuant to section 654, and appellant's aggregate determinate sentence is reduced by two years eight months (i.e., 32 months).

**XVII. The Sentences in Counts 3 and 11 Must Be Stayed.**

Appellant contends that the sentences imposed against him in counts 3 and 11 must be stayed pursuant to section 654. He argues that these convictions were not divisible from his other criminal acts during the living room and carrying incidents. We agree, and we will further modify the judgment to reflect that these sentences are stayed.

**A.     The conduct underlying the convictions for the living room incident.**

Regarding the living room incident, Doe testified that, when she was 10 years old, appellant told her to go to the living room when her mother was not home. She complied. Once there he told her to undress, which she did, and he removed his clothes. According to Doe, she was lying down and appellant was above her. She said appellant touched her with his penis on her vagina. When asked to clarify, she explained that appellant's penis "touched inside" of her, and it went inside of her vagina "[m]ore than one time." She believed this incident lasted more than one hour.

During closing argument, the prosecutor did not assert that appellant committed separate criminal acts during the living room incident. Instead, the prosecutor argued that the lewd conduct supporting the charge in count 3 occurred when appellant touched Doe by putting his penis inside her vagina for over an hour. Appellant was "gratifying himself." The prosecutor never stated or even reasonably suggested that appellant could be guilty in count 3 based on conduct that was separate and apart from his sexual penetration of Doe.

Regarding the living room incident, the jury convicted appellant of three crimes: (1) engaging in sexual intercourse with a victim 10 years of age or younger (§ 288.7, subd. (a); count 1); (2) accomplishing an act of sexual intercourse by means of force, violence, duress, menace or fear of immediate or unlawful bodily injury (§ 261, subd. (a)(2); count 2); and (3) committing a lewd and lascivious act upon Doe (§ 288, subd. (b)(1); count 3).

92.

At sentencing, the prosecutor argued that the sentence in count 3 should not be stayed. According to the prosecutor, Doe had testified that, before he inserted his penis into her vagina, appellant had touched her body all over her breasts, her buttocks, and her vaginal area.[22] The court stayed the sentence in count 2, but it did not stay the sentence in count 3. The trial court did not explain its reasoning.

Respondent concedes that Doe's testimony does not match the prosecutor's recollection of the evidence regarding the living room incident when the prosecutor asserted to the court it was appropriate to not apply section 654 to count 3. Respondent acknowledges that Doe only testified about appellant using his penis during this incident.[23] Nevertheless, respondent argues that multiple punishments are appropriate because Doe testified that appellant penetrated her multiple times.

We reject respondent's position. To uphold the trial court's sentencing decision regarding section 654, substantial evidence must exist in the record showing that the defendant harbored separate criminal objectives for each offense. (*People v. Brents* (2012) 53 Cal.4th 599, 618.) It is generally a factual matter regarding whether the facts and circumstances reveal a single intent and objective within the meaning of section 654. (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1414.)

Here, not only did the prosecutor provide an incorrect recitation of the facts at sentencing regarding what had transpired during the living room incident, the court's sentencing decision is not supported by substantial evidence. Doe only described a single act of sexual intercourse during the living room incident wherein appellant placed his penis inside her vagina. Doe did not describe multiple sexual acts separated by time. Instead, Doe's testimony demonstrates that appellant had held only a single criminal

---

[22] The report from the probation department did not address whether section 654 should be applied to stay the sentence in count 3.

[23] Doe did tell Fausnett that appellant had touched her breasts and buttocks, but it was not clear when those touchings occurred.

intent. As the prosecutor argued to the jury, appellant's lewd conduct was based on his act of sex with Doe. Thus, section 654 must be applied to the sentence in count 3. (See *People v. Scott* (1994) 9 Cal.4th 331, 344, fn. 6 [a defendant who sexually assaults a child under age 14 can be convicted under section 288 and another applicable statute for the same criminal act, but he cannot be separately punished for each offense].)

As we discussed earlier in this opinion, it is unnecessary to remand this matter for resentencing because the trial court already imposed the maximum possible sentence against appellant. Therefore, we will direct the trial court to modify the applicable determinate abstract of judgment to reflect that the sentence imposed in count 3 is stayed pursuant to section 654, and appellant's aggregate determinate sentence is further reduced by 20 years.

**B.      The conduct underlying the convictions during the carrying incident.**

Regarding the carrying incident, Doe testified that, when she was 11 or 12 years old, she was asleep one night and appellant carried her into the living room. He removed his clothes and her clothes. Once naked, he did the "same thing as always." He placed his penis inside her vagina. She thought it lasted more than an hour, maybe two hours.

Doe testified that she was "crying and moving" during this incident. Appellant told her that the longer she took, the longer she would have to be there. She was hurting, tired, sad and scared. She tried to push him away. He was mad, and he looked at her "all mean." He would get irritated and would not let her go to sleep. He held down her arms.

Appellant was convicted in two counts associated with the carrying incident: (1) unlawfully accomplishing an act of sexual intercourse with Doe (§ 261, subd. (a)(2); count 11); and (2) committing a lewd and lascivious act (§ 288, subd. (b)(1); count 12). During the sentencing hearing, the prosecutor argued that separate and distinct acts had occurred during this incident. According to the prosecutor, Doe testified that appellant

touched her private parts with his hand before he inserted his penis into her vagina. The court did not stay the sentence in either count 11 or 12.

We agree with appellant that the record does not support the court's sentencing decision in count 11. The prosecutor provided an incorrect recitation of the facts. Doe did not testify that, during the carrying incident, appellant had touched her private parts with his hand before he inserted his penis inside her vagina. To the contrary, Doe only testified that appellant penetrated her vagina with his penis.

The evidence does not establish or even reasonably suggest that appellant held multiple criminal intents during the carrying incident. Instead, Doe's testimony only demonstrated that appellant engaged in a single act of vaginal sex with her. Consequently, we agree with appellant that the sentence in count 11 must be stayed pursuant to section 654. We will direct the trial court to modify the applicable determinate abstract of judgment to reflect that the sentence imposed in count 11 is stayed pursuant to section 654, and appellant's aggregate determinate sentence is further reduced by 16 years.

## XVIII. Appellant's Sentence Is Not Cruel and/or Unusual.

Appellant was sentenced to an indeterminate term of 55 years to life, along with a consecutive determinate term of 127 years six months. The trial court made all of the sentences consecutive. We have already explained that we will stay the sentences in counts 3, 11, 14 and 17. As modified, appellant is sentenced to an indeterminate prison sentence of 55 years to life, along with a consecutive determinate term of 88 years eight months.

Appellant asserts that his original sentence represented cruel and/or unusual punishment under the federal and California Constitutions. He contends he has a de facto life sentence that does not serve a legitimate penal purpose and is disproportionate to his culpability. He seeks a remand for resentencing.

We reject appellant's arguments. Neither his original sentence nor the current modified version represent cruel and/or unusual punishment under either the federal or state Constitutions.

### A.      *The claim under the Eighth Amendment.*

The Eighth Amendment of the United States Constitution prohibits the infliction of "cruel and unusual" punishments.[24] (*In re Alva* (2004) 33 Cal.4th 254, 266.)  A punishment violates the Eighth Amendment if it involves the "unnecessary and wanton infliction of pain" or if it is "grossly out of proportion to the severity of the crime." (*Gregg v. Georgia* (1976) 428 U.S. 153, 173.)  When the length of a particular sentence is challenged, the appellate court considers all of the circumstances to determine if the sentence is unconstitutionally excessive.  (*Graham v. Florida* (2010) 560 U.S. 48, 59.)

The United States Supreme Court has concluded that neither a 25-year-to-life sentence for stealing three golf clubs nor a 50-year-to-life sentence for stealing videotapes valued at $153 constituted cruel and unusual punishment.  (*Ewing v. California* (2003) 538 U.S. 11, 30–31; *Lockyer v. Andrade* (2003) 538 U.S. 63, 77.)  In the present case, by contrast, appellant committed repeated acts of sexual molestation against his own daughter, who was very young.  Appellant committed these heinous acts to satisfy his own sexual desires.  Doe testified that the incidents that form the basis for appellant's convictions were the ones that she remembered best, but appellant had forced her to undergo many other incidents of sex.  She said that appellant put his penis in her vagina "[j]ust about" every day.

Appellant physically attacked Doe on one occasion when she resisted.  He hit her arm and choked her.  During the carrying incident, he physically held down her arms while having sex with her.  Doe described being in pain and crying during the specific

---

[24]      The guarantee of the Eighth Amendment applies to the states through the Fourteenth Amendment of the United States Constitution.  (*Rhodes v. Chapman* (1981) 452 U.S. 337, 344–345.)

incidents of sex that she described for the jury. Appellant sometimes gave her pain pills after having sex with her.

At sentencing, the trial court noted that appellant had inflicted serious emotional distress upon Doe, he took advantage of a position of trust, and appellant showed no signs of remorse.[25] The court concluded that appellant had displayed "a high degree of cruelty, viciousness, and callousness." The court believed that appellant posed "a serious danger to society" and to Doe.

Given the United States Supreme Court precedent and the nature of appellant's crimes, appellant's sentence—especially as modified in this opinion—does not constitute cruel and unusual punishment under the Eighth Amendment. The totality of the circumstances does not demonstrate or even reasonably suggest that his sentence is grossly disproportionate to his conduct. (See *People v. Gomez* (2018) 30 Cal.App.5th 493, 499–500 [rejecting a similar argument in a sexual molestation case resulting in a sentence of 35 years to life].) Consequently, appellant's Eighth Amendment claim fails.

### B. The claim under the California Constitution.

Article I, section 17, of the California Constitution prohibits the infliction of " '[c]ruel or unusual' " punishments.[26] (*In re Alva*, *supra*, 33 Cal.4th at p. 266.) A punishment may violate article I, section 17, of the California Constitution if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424, superseded by statute on other grounds as explained in *In re Palmer* (2021) 10 Cal.5th 959, 974.)

---

[25] At sentencing, appellant informed the court through his attorney that he was innocent.

[26] The California Supreme Court has "never suggested that article I, section 17 employs a different or broader definition of 'punishment' itself than applies under the Eighth Amendment." (*In re Alva*, *supra*, 33 Cal.4th at p. 291.)

Three criteria are used to determine whether a sentence is "cruel or unusual" under article 1, section 17, of the California Constitution: (1) the nature of the offense and the offender (with particular attention to the degree of danger both factors may pose to society); (2) a comparison of the sentence with those for other more serious offenses under California law; and (3) a comparison of the sentence with those in other states for the same offense. (*In re Lynch*, *supra*, 8 Cal.3d at pp. 425–427.) Proportionality may be shown by any of the three relevant factors. (*People v. Dillon* (1983) 34 Cal.3d 441, 487, fn. 38 (plur. opn. of Mosk, J.).) A defendant bears a "considerable burden" of proof to establish one of these factors. (*People v. Wingo* (1975) 14 Cal.3d 169, 174.)

Appellant argues that other penal statutes in California result in a shorter prison sentence than the life sentence he received in count 1 for violating section 288.7, subdivision (a). For instance, he notes that a defendant may gang-rape an 11-year-old, but only receive a prison sentence of 10 to 14 years. (§ 264.1, subd. (b)(1).) The comparisons which appellant raise are unpersuasive. The length of a punishment does not violate the Constitution merely because the Legislature may have chosen to permit a lesser punishment for another crime. (*People v. Gomez*, *supra*, 30 Cal.App.5th at p. 502.) In any event, appellant did not commit a single sex crime against Doe. Instead, he repeatedly molested her over a three-year period. It is not appropriate to compare his sentence, which is based on 14 felonies, with that of any single penal statute.

A strong public policy exists to protect young children. (*People v. Olson* (1984) 36 Cal.3d 638, 646.) Lewd conduct on a child is particularly grave because it can result in lifelong consequences regarding the victim's well-being. (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806.) Courts have upheld sentences in multiple child molestation cases that exceed the lifetime of the defendant and effectively represent a de facto life sentence without the possibility of parole. (See, e.g., *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1222–1223 [upholding sentence of 135 years to life for 16 felony offenses arising from the molestation of four children]; *People v. Bestelmeyer* (1985) 166

Cal.App.3d 520, 532 [affirming 129-year sentence for 25 counts of sexual assault on stepdaughter].)

Based on this record, no constitutional infirmity exists. Appellant engaged in repeated sexual acts with his young daughter over a three-year period. She was physically and emotionally victimized. He fails in his considerable burden to establish that his sentence is disproportionate to either the nature of his offenses, or to other penal laws. Therefore, this claim is without merit and resentencing is not required.

## DISPOSITION

Appellant's judgment is modified as follows: The sentences imposed in counts 3, 11, 14 and 17 are stayed pursuant to section 654, resulting in a total determinate sentence of 88 years eight months, and a consecutive indeterminate term of 55 years to life. The trial court shall prepare an amended determinate abstract of judgment that accurately reflects these modifications, and the court shall forward the amended abstract of judgment to the appropriate authorities. In all other respects, the judgment as modified is affirmed.

LEVY, ACTING P. J.

WE CONCUR:

FRANSON, J.

MEEHAN, J.